## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| CURTIS T. PEDERSEN and BEVERLY LEUTLOFF, individually and on behalf of all others similarly situated, | ) ) ) ) ) | Case No. 21-10388 |
| Plaintiffs, | ) ) | |
| v. | ) ) | HON. MARK A. GOLDSMITH United States District Judge |
| KINDER MORGAN, INC., KINDER MORGAN RETIREMENT PLAN A, KINDER MORGAN RETIREMENT PLAN B, T. MARK SMITH, JESSE ARENIVAS, ADAM FORMAN, MICHAEL GARTHWAITE, KENNETH GRUBB, MARK HUSE, and MATTHEW WOJTALEWICZ, | ) ) ) ) ) ) ) ) | HON. ANTHONY P. PATTI United States Magistrate Judge |
| Defendants. | ) ) | |

## AMENDED COMPLAINT

### Nature of Action

This is a class action under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. 1001 *et seq*. It is also a case study in what can happen to the retirement benefits of employees after a series of corporate acquisitions and divestitures. Under ERISA, the Kinder Morgan Retirement Plan is required to preserve all accrued benefits from previous retirement plans. Curtis Pedersen was, for example, entitled to an unreduced early retirement benefit of

$3,679.98 per month starting on December 1, 2019, the first of the month after he turned age 62.

However, after three corporate acquisitions and one divestiture, a "detailed" calculation of his benefits prepared by Kinder Morgan shows that key plan terms and statutory protections have been silently dropped, reinterpreted, revised, and cutback, so that the monthly retirement benefits to which Mr. Pedersen is entitled has been decreased to $1,933.69, which represents only 52.5% of the retirement benefits he is due. Similar reductions have been made to the retirement benefits of Ms. Leutloff and thousands of other class members. These reductions were achieved by (1) decreasing the participants' accrued benefits at retirement, and (2) modifying the factors for early retirement to reduce benefits further.

As set out below, Kinder Morgan's "detailed" calculations violate ERISA's prohibition on "backloading" benefit accruals, its "anti-cutback" protection for age 65 and early retirement benefits, its disclosure rules for benefit restrictions and reductions, and its "actuarial equivalent" requirements, as well as violating plan terms that were to be "honored" under the provisions of corporate sales agreements relating to the benefit obligations of acquired companies to their employees.

## The Parties

1.     Named Plaintiff Curtis T. Pedersen is a participant in the Kinder Morgan Retirement Plan A who resides in Fenton, MI (Livingston County). Mr. Pedersen was born in November 1957, and worked for the ANR Company from June 1979, when he was age 21, until November 2015 when he was age 58. After a series of corporate mergers, Mr. Pedersen's retirement benefits are now covered under the Kinder Morgan Retirement Plan A. Mr. Pedersen reached age 62 in November 2019 and commenced his retirement benefits under the Retirement Plan on December 1, 2019.

2.     Named Plaintiff Beverly Leutloff is a participant in the Kinder Morgan Retirement Plan A who resides in Manteno, IL. Ms. Leutloff was born in November 1958 and has worked for the ANR Company from March 1978 when she was age 19 until the present. As with Mr. Pedersen, Ms. Leutloff's retirement benefits are now covered under the Kinder Morgan Retirement Plan A after a series of corporate mergers. Ms. Leutloff reached age 62 in November 2020, but did not commence her retirement benefits from the Kinder Morgan Retirement Plan A because Kinder Morgan's Claims Administrator denied that she was eligible for "unreduced" retirement benefits at age 62.

3.     Defendant Kinder Morgan, Inc. ("Kinder Morgan") was founded in 1997 by a group of investors led by Richard Kinder, a former President of the Enron Corporation who now serves as the executive chairman of Kinder Morgan. After Kinder Morgan acquired the El Paso Corporation in 2012, the El Paso Pension Plan was merged into the Kinder Morgan Retirement Plan effective December 31, 2012. Kinder Morgan is the plan sponsor for the Kinder Morgan Retirement Plan A and the Kinder Morgan Retirement Plan B, and it is responsible for maintaining the Kinder Morgan Retirement Plan A and Plan B in compliance with ERISA and for appointing and removing all of the fiduciaries with discretionary responsibilities related to the retirement plan.

4.     On December 4, 2017, the Defendant Kinder Morgan Retirement Plan A replaced the Kinder Morgan Retirement Plan for these employees. The Kinder Morgan Retirement Plan A is an entity for purposes of suit under ERISA §502(d)(1), 29 U.S.C. 1132(d)(1), as is the Kinder Morgan Retirement Plan B that was spun off from "Plan A" less than one month later..

4A.    According to the ERISA-required "Form 5500 Annual Return/Report" for the Plan in 2018:

"The Kinder Morgan Retirement Plan A ("Plan A") was created as a result of a de minimis spin-off from the Kinder Morgan Retirement Plan ("KMRP") effective December 4, 2017.... Additionally, effective

> January 1, 2018, Plan A spun off part of its population to a new plan,
> the Kinder Morgan Retirement Plan B ("Plan B")."

The "Plan B" that was spun-off from "Part A" covers vested participants "whose

accrued benefits had an estimated present value as of December 31, 2017 of less

than $150,000" and who were not employed with Kinder Morgan on January 1,

2017. Because Plan A, too, covers vested participants who were not employed with

Kinder Morgan on January 1, 2017, the only difference between the participants in

Plan A and Plan B is the present value of their benefits, which is not legally or

equitably significant. Therefore, except where otherwise indicated below,

references to the "Plan" include both "Plan A" and "Plan B" because both originate

from the same Plan and the terms of both are identical, except for the estimated

value of the participants' benefits.

5.      The Defendant Claims Administrator for the Kinder Morgan

Retirement Plan A and Plan B is T. Mark Smith who is also Vice President for

Human Resources at Kinder Morgan. The Claims Administrator is a fiduciary under

ERISA.

6.      The Defendant Kinder Morgan Retirement Plan A Fiduciary

Committee, which also serves as the Fiduciary Committee for Plan B, has offices at

1001 Louisiana St., Suite 1000, Houston, TX 77002, and has the responsibility for

appeals of benefit claim denials. Under the terms of the Retirement Plan, the Fiduciary Committee has at least three members.

7.     Defendant Jesse Arenivas is Chairman of the Kinder Morgan Retirement Plan A Fiduciary Committee. Mr. Arenivas also serves as CEO of "CO2," which is a wholly-owned subsidiary of Kinder Morgan.

7A.     The names of five additional members of the Fiduciary Committee were unknown on the date the original Complaint was filed, but were disclosed by Defendant T. Mark Smith on the day after it was filed: The names of the additional Committee members are Adam Forman, Michael Garthwaite, Kenneth Grubb, Mark Huse, and Matthew Wojtalewicz. These individuals are all Kinder Morgan officers: Adam Forman is Deputy General Counsel of Kinder Morgan; Michael Garthwaite is Chief Commercial Officer; Kenneth Grubb is Chief Operating Officer of Kinder Morgan's Gas Pipelines; Mark Huse is Chief Information Officer of Kinder Morgan; and Matthew Wojtalewicz is Controller.

7B.     None of the named defendants have personal knowledge of any events related to the Plaintiffs' claims that occurred prior to Kinder Morgan's 2012 acquisition of El Paso and the merger of El Paso's Pension into Kinder Morgan's Retirement Plan. The same absence of personal knowledge applies to Kinder

Morgan's Director of Benefits, Chris Noonan, and the members of the three-person team who assist him.

8.     The Defendant Chairman Jesse Arenivas and all members of the Fiduciary Committee are fiduciaries under ERISA §3(21), 29 U.S.C. 1002(21). Fiduciaries are potentially personally liable for breaches of fiduciary duties, although many plan sponsors provide bonding and insurance for such liabilities, and relief under ERISA generally does not entail personal liability.

## Jurisdiction and Venue

9.     This Court has jurisdiction over the subject matter of this action pursuant to the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. 1132(e)(1), and 28 U.S.C. 1331.

10.     Venue is proper in this Court under 29 U.S.C. 1132(e) in that the Plaintiffs earned benefits in this District, breaches took place in this District, and the Plan may be found in this District.

10A.   On March 31, 2021, over one month after the Complaint was filed on February 22, 2021, counsel for the Kinder Morgan Defendants represented that the Kinder Morgan Retirement Plan contains a forum selection clause providing that:

> "Venue for any dispute arising under this Plan shall be the applicable state or federal court in Houston, Texas ...."

The foundation for the application of any plan term, including a forum selection clause, is that it must be valid. Here, The sentence on venue appears to have been added to a Plan document adopted on December 1, 2017, with no authorization from the Kinder Morgan Board of Directors or any authorized delegate of the Board. The Governance Charter for the Kinder Morgan Board's Compensation Committee provides that:

> "The [Compensation] Committee will propose the adoption, amendment, and termination by the Board, and stockholders, if required, of appropriate ... pension and profit sharing plans ...."

The Plan document likewise provides that amendments and other modifications are only made by the Board or with the Board's written authorization:

> "The Plan may at any time and from time to time be amended, modified or terminated, by written instrument which is duly adopted by the Board on behalf of the Company or any individual(s) or entity acting pursuant to written authorization of the Board to adopt the Plan amendment."

Absent Board action or written authorization of the Board, the only other authority to amend the Plan is limited to amendments to meet the requirements of ERISA or other law:

> "[T]he most senior Human Resources officer of the Company may approve and adopt any written amendment to the Plan that such officer deems is necessary or appropriate to meet the requirements of ERISA, the Code, or any other law as now in effect or as hereafter enacted or amended ...."

8

Unless there was written authorization of the Board, the "VP for HR, Admin. & IT" who signed the "Plan A" on December 1, 2017 and the "Plan B" on January 1, 2018, had authority only to adopt an amendment that he or she "deems is necessary or appropriate to meet the requirements of ERISA, the Code, or any other law as now in effect or as hereafter enacted or amended." Plaintiffs' counsel have twice asked for any written authorization of the Board to adopt this forum provision and Defendants' counsel have refused to provide any such document in emails dated 4/30/2021 and 5/11/2021 – the earlier of which refused to produce on the ground that the "the venue provision was not an amendment, it was in the plan document at the outset," and the latter of which refused to produce any authorization from the Board as "not relevant."

10B.   The forum selection clause in both Plan A and Plan B is buried in a voluminous 512-page document under a section for "Plan Administration - Miscellaneous" and a subsection for "Governing Law" (Defendants have to date not produced the full Plan B document, but they represent that the terms of Plan A and Plan B are identical). The forum clause was placed not where a similar restriction for a one-year statute of limitations for civil actions appears. That restriction was added under "Civil Actions Under ERISA Section 502(a)."  Even without the fiduciary duty to the participants established by ERISA, the Civility Principles in

9

this District prohibit slipping in a additional provision somewhere in a legal document without specific notice:

> "We will not include in a draft matters to which there has been no agreement without specifically advising other counsel of the addition."

Here, plan participants are persons to whom not just duties of civility but fiduciary duties are owed, but they were never "specifically advis[ed] of the addition." In the ERISA context, the IRS has standards comparable to the Civility Principles for qualified pension and profit-sharing plans: When a plan is "amended and restated," a new plan provision cannot be slipped into the "restated" plan in a manner such that the new provision cannot be identified.

10C.   The language of the forum selection clause and the context in which it appears are ambiguous. The clause is in the passive voice, i.e., "[v]enue for any dispute arising under this Plan shall be the applicable state or federal court in Houston, Texas," without saying whose actions are limited in this manner, e.g., the Plan, Kinder Morgan, current employees, former employees, the U.S. Department of Labor, or third parties who may have other disputes like the multiple service-providers who are paid by the Plan. By contrast, the forum selection clause that the Sixth Circuit approved in *Smith v. AEGON Companies Pension Plan*, 769 F.3d 922, 926 (6th Cir. 2014), provided that "[a] participant or beneficiary shall only bring an

action in connection with the Plan in Federal District Court in Cedar Rapids, Iowa).

The forum clause in Kinder Morgan's Plan is also ambiguous because it does not

provide that venue shall "exclusively" or "only" be in the applicable state or federal

court in Houston, Texas. There is a further ambiguity as to what types of claims are

covered because it is unclear the clause's reference to "any dispute arising under

this plan" includes "statutory" claims. The language and its location in a section on

"Plan Administration - Miscellaneous" weigh against interpreting it to cover

"statutory" claims.

   10D.   At least by December 1, 2017, Kinder Morgan's Director of Benefits

and all of the persons with fiduciary duties to plan participants knew that the Plan

document that the "VP for HR, Admin. & IT" had signed included this forum

selection language. But nearly three and one-half years later, Kinder Morgan has

still never disclosed it in its SPD, in adverse benefit determination letters, or in any

other communication to participants "specifically advising ... of the addition."

Kinder Morgan and the Plan's fiduciaries did not disclose any mandatory forum

selection clause, including for statutory claims, in the SPDs for Plan A or Plan B

distributed in April 2018, in the SPD that is currently available online, or in any

adverse benefit determination letters issued after that date. Under "Your Benefit

Rights (ERISA)" the SPD states:

11

> "If you have a claim for benefits that is denied or ignored, in whole or
> in part, you may file suit in a Federal court."

*Id.* at 25-26. "If [participants] have questions about this statement or your rights

under ERISA," participants are directed to contact the U.S. Department of Labor,

not Kinder Morgan. *Id.* at 26. The SPD further promises that if your claim to

benefits is denied:

> "The Plan Administrator will provide you with a statement of your
> right to bring an action under Section 502(a) of ERISA."

*Id.* at 31. But no statement of your rights has been provided that discloses an

exclusive restriction on the venue for such an action. The "Plan B" SPD likewise

does not contain any disclosures about a mandatory forum selection provision and it

makes affirmative representations that "you may file a suit in a Federal court" and

that "The Plan Administrator will provide you with a statement of your right to

bring an action under Section 502(a) of ERISA."

10E.   Similarly, the adverse benefit determination letters sent to Mr.

Pedersen by the Claims Administrator and the Fiduciary Committee,, the latest of

which was dated August 31, 2020 – nearly three years after the adoption of "Plan

A" with the forum selection clause – affirmatively describes "the right to bring a

civil action under ERISA §502(a)" with no disclosure that Kinder Morgan has

restricted this right to bring suit only in Houston, Texas, which is over 1,300 miles

12

away for the Plaintiffs. In addition to the adverse benefit determination letters to Mr. Pedersen, Plaintiffs are in possession of other adverse benefit determination letters, e.g., to Beverly Leutloff, Randall Schmidgall and Bruce Hopper, none of which discloses any restriction on the court that a suit may be brought in.

### Class Action Allegations

11.     Plaintiffs are bringing this action as a class action in accordance with Federal Rule of Civil Procedure 23 to resolve disputes under the Employee Retirement Security Act of 1974, as amended.

12.     Plaintiffs bring this action on behalf of themselves and all other similarly situated employees who have participated in the Kinder Morgan Retirement Plan A, including those who were "spun off" from Plan A to Plan B because the estimated present value of their benefits was less than $150,000. The proposed class is defined as any and all persons who have participated in the Kinder Morgan Retirement Plan A or Plan B who::

> (1)     Are current or former employees of the ANR Company, or for Claims I - III the Coastal Corporation, and

> (2)     Participated in the El Paso Pension Plan after El Paso acquired the Coastal Corporation in 2001.

13.     On information and belief, the proposed class numbers over 10,000 individuals, making joinder impracticable.

14.     Common questions of law and fact affect the rights of the members of the class. The claims of the named Plaintiffs are typical of the claims of the members of the class. The named Plaintiffs will fairly and adequately protect the interests of the class. Plaintiffs' counsel are experienced in class action litigation involving pension plans.

15.     This action is best maintained as a class action because Defendants have acted and/or refused to act on grounds generally applicable to the class the named Plaintiffs represent, thereby making appropriate final declaratory, injunctive and other equitable relief in favor of Plaintiffs and the class. In addition, the prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants. Judicial economy dictates resolving all issues in a single action in accordance with Federal Rule of Civil Procedure 23.

## **General Allegations**

16.     The American Natural Resources (ANR) Company is a natural gas pipeline owner and operator in the Midwest, headquartered in Detroit, MI. It was started in the 19th century as the Detroit Natural Gas Light Company.

16A.   According to a March 15, 1985 *New York Times* article entitled "Coastal Bid is accepted by A.N.R.," at the time of Coastal's acquisition of it in

14

1985, A.N.R. had 11,000 employees. According to the article, A.N.R. accepted Coastal's "assurances that the bulk of American's 11,000 employees, most of them with operating subsidiaries, will be retained." Coastal also "agreed in writing to keep American's headquarters in Detroit and to continue operating, for at least two years, the company's principal businesses."

17.     The Coastal Corporation which was founded by Oscar Wyatt in 1955 and based in Houston, TX. In March of 1985, the Coastal Corporation acquired the ANR Company. ANR continued to exist as a separate corporate subsidiary owned by the Coastal Corporation.

18.     The El Paso Corporation originated in 1928 as El Paso Natural Gas Company and was headquartered in El Paso, TX. In January 2001, the El Paso Corporation acquired the Coastal Corporation, including its ANR subsidiary, and merged Coastal Corporation into the El Paso Corporation. At the time of the merger, the number of Coastal employees outnumbered the number of El Paso employees by a ratio of almost three to one.

19.     On February 22, 2007, the El Paso Corporation sold the ANR Pipeline subsidiary to TransCanada American Investments LTD which is a wholly-owned subsidiary of the TransCanada Corporation. In April 2007, ANR Pipeline "delisted" its securities from registration under the Securities Exchange Act, thereby ending its

public disclosures. But ANR Pipeline continued to exist as a separate corporate entity. ANR Pipeline's continued existence is documented not only in corporate records for the State of Michigan, but also in litigation such as *Wright v. ANR Pipeline Co.*, 652 Fed.Appx. 268 (5th Cir. 6/14/2016).

20.     In May 2012, the El Paso Corporation ("El Paso") was acquired by Kinder Morgan, Inc. ("Kinder Morgan"), which is based in Houston, TX. As a result of that acquisition, El Paso was merged into Kinder Morgan.

21.     The ANR Company had a pension plan which was established in 1960, and merged into the Coastal Corporation Pension Plan in December 1986. The ANR Plan's benefit formula was based on 2% of final average pay for credited service up to 30 years. The plan offered early retirement benefits for employees who attained age 55 with ten years of service with no reduction for retirement at age 62.

22.     The Coastal Corporation had a pension plan which was established in 1967. The Coastal Corporation's benefit formula was 2% of final pay times years of credited service up to a maximum of 30 years, with a Social Security offset. The plan offered early retirement benefits for employees who attained age 55 with five years of service.

23.     The El Paso Corporation had a pension plan which was established in

1992. The El Paso Corporation plan's benefit formula was also a 2% of final pay

formula. The plan also offered early retirement benefits for employees who attained

age 55 with five years of service. El Paso converted its defined benefit plan to a

cash balance formula in 1997, but provided a multi-year transition benefit under its

defined benefit formula that continued to provide the operative benefit for many

participants.

24.     After El Paso acquired Coastal, the Coastal Pension Plan and the El

Paso Pension Plan were merged effective March 31, 2001.  Section 6.10 of the sales

agreement between El Paso and Coastal provided that El Paso "shall assume and

honor the obligations of the Company [Coastal] and its Subsidiaries [which

included ANR Pipeline] under all existing Company Employee Plans and shall

perform the obligations of the Company and its Subsidiaries in the same manner

and to the same extent that the Company and its Subsidiaries would have been

required thereunder." The agreement also provided that El Paso "intends to ...

provide ... employee benefits to the Company Employees which will be

substantially similar, in the aggregate, to the ... employee benefits that [El Paso]

provides to similarly situated employees."

25.     The proxy statements for the merger made the same representations in

less formal language under the heading "Treatment of Coastal Employee Benefit

Plans, promising "to honor Coastal's obligations under these plans" and "to provide continuing Coastal employees with ... employee benefits substantially similar to those it provides to similarly situated El Paso employees."

26.    The four corporate transactions described above of ANR by Coastal in 1985, of Coastal by El Paso in 2001, of ANR by TransCanada in 2007, and of El Paso by Kinder Morgan in 2012, were all accomplished via acquisitions and sales of stock with the corporate entities remaining intact under different control, e.g., the ANR Company continued to exist after the Coastal Corporation acquired it in 1985 as a wholly-owned subsidiary and when the El Paso Corporation acquired the Coastal Corporation in 2001, the ANR Company continued to exist as a corporate entity, now owned by the El Paso Corporation.

27.    When the Coastal Corporation acquired ANR in 1985, it amended the Coastal pension plan to provide for a "grandfather" of the ANR benefit formula and for participants to earn benefits under the Coastal Plan's benefit formula and receive the higher of the two.

28.    In 1996, the El Paso Corporation amended its pension plan to a cash balance formula effective January 1, 1997. But during a "transition period" to December 31, 2001, plan participants accrued benefits under both the old benefit

formula and the new cash balance formula with participants to receive the higher of the two.

29.     When the El Paso Corporation acquired the Coastal Corporation in 2001, it merged the Coastal Corporation Pension Plan with its own Plan and moved the Coastal Plan participants, including the ANR employees, under the El Paso Pension Plan's formula except that their transition period ran from April 1, 2001 to March 31, 2006.

30.     The 2000 10-K for the ANR Corporation filed in March 2001, recognized that the "pension obligations of our employees would remain the obligation of the [El Paso] pension plan if we were to withdraw."

31.     The El Paso Corporation's 2002 Application for Determination requested that the determination letter apply to the Coastal Plan, "which was merged into the Plan effective April 1, 2001."

32.     After TransCanada acquired the ANR subsidiary from El Paso in 2007, TransCanada did *not* move the benefits that the ANR employees had previously accrued under the El Paso Plan to its own Retirement Plan, but instead provided that its Plan would provide future retirement income for "credited service earned on and after January 1, 2008, with "any benefit that you earned under the former El Paso

Corporation Pension Plan" being paid in addition to the post-January 1, 2008

benefit.

33.    Section 3.2(b) of the El Paso Plan provided that a participant is eligible

for an early retirement benefit if he or she "terminates employment after attaining

age 55 and completing ten (10) Years of Credited Service." Following the 2007 sale

of the ANR subsidiary, the El Paso Corporation adopted the "Ninth Amendment"

which amended the early retirement provisions in Section 3.2 to provide that:

> "Notwithstanding any other Plan term to the contrary, a Participant
> who ... is an Employee of ANR Pipeline Company or any other
> Affiliated Company, on the date on which ANR Pipeline Company
> ceases to be an Affiliated Company ... shall be deemed to have
> terminated employment after attaining age 55 for purposes of
> determining whether the Participant is entitled to an Early Retirement
> Benefit in lieu of a Vested Termination Benefit, but not for
> determining the Participant's earliest Early Retirement Date ...
> provided that the Participant is at least age 53 and has not yet attained
> age 55 on the Closing Date."

34.    A February 14, 2007 Notice about the Ninth Amendment said that if an

ANR employee "has not attained age 55 ... as of the earlier of the closing date of the

Sale or February 28, 2007, he or she will not be eligible for the more favorable 4

percent reduction factors upon termination of employment. The Notice said nothing

about the plan provision under which benefits are unreduced at age 62.

20

35.     When the El Paso Corporation was acquired by Kinder Morgan in 2012, Kinder Morgan merged El Paso's Pension Plan into Kinder Morgan's with Appendix X (also referred to as the "Coastal Appendix") to reflect special rules for employees of the Coastal Corporation and its subsidiaries, including the ANR employees.

36.     A "detailed" calculation that Kinder Morgan provided Curtis Pedersen on October 11, 2019, decreased the monthly retirement benefits to which he is entitled to $1,933.69, which represents only 52.5% of the $3,679.98 per month retirement benefits that he is due with the calculation set forth in ¶41 below.

37.     In a November 5, 2019 internal appeal, counsel for Mr. Pedersen explained how the "detailed" calculation that Kinder Morgan provided violated ERISA and the Retirement Plan's terms. Counsel for Mr. Pedersen essentially submitted these claims to the Fiduciary Committee twice. Mr. Pedersen as well as Beverly Leutloff and Randall Schmidgall had already submitted them without the assistance of counsel.

38.     Pedersen's counsel re-explained the basis for these claims in a June 18, 2020 response to a February 27, 2020 denial letter by T. Mark Smith as "Claims Administrator" for the Plan. Mr. Pedersen thereby gave Kinder Morgan and the

Fiduciary Committee a final opportunity in that response to grant these claims for relief before a complaint is filed.

39.     Exhaustion of the Kinder Morgan Retirement Plan's procedures was not even required because: (1) these are statutory claims and (2) Kinder Morgan had already said that Mr. Pedersen and others had exhausted the Plan's claim procedures before they were represented by counsel. *See, e.g., Richards v. General Motors Corp.*, 991 F.2d 1227, 1235 (6th Cir. 1993); *Wallace v. Oakwood Healthcare, Inc.*, 954 F.3d 879, 887 (6th Cir. 2020).

40.     But Kinder Morgan's Fiduciary Committee denied the claims again on August 31, 2020, and stated that his only recourse was to file this lawsuit within one year of that date. Mr. Pedersen thereby "exhausted" Kinder Morgan's claims procedures on behalf of himself and all others similarly situated.

## Claim I

## Violation of ERISA's Restrictions on Backloading of Benefit Accruals

41.     ERISA §204, 29 U.S.C. 1054, establishes minimum benefit accrual standards to limit "backloading" of benefit accruals to later years of participation in the Plan. There are three accrual methods that are acceptable: the 3% rule, the 133-1/3% method, and the fractional rule.

22

42.    IRS Document 6390 (rev. 12-98) provides that "Plans that meet the accrual rules are divided into two categories – plans that parallel the language of the statute and plans that otherwise satisfy the requirements though they do not contain specific statutory language."

43.    When the "fractional rule" is applied to determine the benefit accruals, ERISA §204(b)(1)(C), 29 U.S.C. 1054(b)(1)(C), provides that the fraction cannot be "less than" when "the denominator ... is the total number of years he would have participated in the plan if he separated at the normal retirement age."

44.    As part of "Uniformity requirements" for the "Period of accrual," Treas. Reg. 1.401(a)(4)-3(b)(2) provides a rule for fractional rule formulas specifying that:

> "Each employee's benefit must be accrued over the same years of service that are taken into account in applying the benefit formula under the plan to that employee…Thus, for example, a plan does not satisfy the safe harbor in paragraph (b)(4) of this section unless the plan uses the same years of service to determine both the normal retirement benefit under the plan's benefit formula and the fraction by which an employee's fractional rule benefit is multiplied to derive the employee's accrued benefit as of any plan year."

Explanation No. 5A on "Safe Harbor Nondiscrimination Requirements Defined Benefit Plans" (Rev. 4-2016) likewise explains that "The years of service over which the benefit accrues are the same as those taken into account under the plan's

benefit formula" and specifically says that for the "fractional rule unit credit safe harbor," "[t]he plan must "satisfy the uniformity requirements."

45.     The Coastal Retirement Plan in which the ANR participants like Mr. Pedersen were placed after Coastal's acquisition of ANR  provides a benefit of 2% of final average monthly earnings for each year of credited service up to a maximum of 30 years. That formula has been preserved (with a revision discussed below) in the "Coastal Appendix" to the El Paso Plan and later in the "Coastal Appendix" to the Kinder Morgan Retirement Plan to determine the retirement benefit for former Coastal employees. *See* Section 4.1(c)(i) in Section 15 of Appendix X (the "Coastal Appendix").

46.     The benefit formula and accrual method used to calculate the retirement benefits of the ANR participants is the same benefit formula and accrual method used for the Coastal Corporation. The Coastal benefit formula has been preserved (as described below, with a subtle but legally significant revision) in an Appendix to the El Paso Plan and then in an Appendix to the Kinder Morgan Plan. Like ANR's benefit formula, the Coastal Plan's benefit formula limits the number of years used to calculate benefits to a maximum of 30 years.

47.     There is no doubt that the benefit accrual method that the Coastal Plan used did not precisely "parallel the language of the statute," although it did use the

24

word "fraction." There is also no question that the benefit accrual method used in the Coastal Plan does not comply with ERISA's 3% rule or its 133-1/3% rule because those rules specify the rate at which "each participant" or "any individual who is or who could be" a participant in the Plan can accrue benefits, something the Coastal Plan does not do.  The issue is whether the Coastal Plan, as Kinder Morgan interprets it, complies with ERISA's "fractional" rule.

48.    ERISA §204(b)(1)(H)(ii) expressly provides that the 30 year limitation in the Coastal Plan's benefit formula is permissible:

> "A plan shall not be treated as failing to meet the requirements of this subparagraph solely because the plan imposes (without regard to age) ... a limitation on the number of years of service or years of participation which are taken into account for purposes of determining benefit accrual under the plan."

49.    For purposes of the "uniformity requirements," the Coastal Plan's benefit formula is a "unit credit" formula rather than a "flat benefit" formula. The 1991 preamble for the nondiscrimination regulations defines "[a] unit credit plan" as a "plan that contains a benefit formula that provides all employees with the same number of years of service the same benefit (either as a percentage of compensation or as a dollar amount)." 1991 IRB Lexis 1638, *20.[1]

_____

[1] Treas. Reg. 1.401(a)(4)-3(b)(4)(i)(C)(2) says by contrast that:

"[A] flat benefit is a benefit that is the same percentage of average

50.     The Treasury Department's benefit accrual regulations further instruct that:

> "A plan may satisfy different [accrual] methods with respect to different classifications of employees, or separately satisfy one method with respect to the accrued benefits for each such classification of employees, provided that such classifications are not so structured as to evade the accrued benefit requirements of section 411(b) and this section. (For example, if a plan provides that employees who commence participation at or before age 40 accrue benefits in a manner which satisfies the 133-1/3 percent method and employees who commence participation after age 40 accrue benefits in a manner which satisfies the 3 percent method of determining accrued benefits, the plan would be so structured as to evade the requirement of section 411(b).)"

Treas. Reg. 1.411(b)-1(a).

51.     When a participant separates from service before age 65, the Coastal Retirement Plan calculates a benefit based on the maximum of 30 years (which Kinder Morgan now calls "Part 1" of the calculation) and then applies a fraction to it. Mr. Pedersen does not dispute the part of Kinder Morgan's October 11, 2019 "detailed" calculation that calculates that the "Part 1" normal retirement benefit for

---

> annual compensation or the same dollar amount for all employees who have a minimum number of years of service at normal retirement age (e.g., 50 percent of average annual compensation), with a pro rata reduction in the flat benefit for employees who have less than the minimum number of years of service at normal retirement age."

Thus, the Coastal benefit formula is not a "flat benefit" formula because all employees who have a minimum number of years of service do *not* receive the same percentage of average annual compensation.

him based on the 2% of pay per year formula for 30 years is $4,127.08 per month
($5,068.07 - $940.99 [Soc. Sec. offset]).

52.     However, the October 11, 2019 calculation of Mr. Pedersen's
retirement benefit shows that Kinder Morgan has applied a "fraction" to that
$4,127.08 normal retirement benefit under which the numerator of the fraction was
limited to his 26.75 years of credited service, *but the denominator* counts the
43.4167 years between his year of hire and age 65, without limiting the
denominator to the maximum of 30 years of service that the participant can be
credited with under the formula.

53.     By applying a "fraction" that uses 43.4167 years in the "denominator"
rather than the maximum of 30 years used in the normal retirement benefit formula,
Mr. Pedersen's "Part 1" retirement benefit of $4,127.08 was "backloaded" to later
years of service. Mr. Pedersen could not accrue the full $4,127.08 unless he worked
for an additional 13.4167 years beyond the 30 years on which the $4,127.08 is
calculated.

54.     With Kinder Morgan's denominator of 43.4167 years, rather than the
30-year maximum on credited service in the Plan, Mr. Pedersen's 2% of pay per
year normal retirement benefit for each of 30 years is "backloaded" to later years of

service and his benefit for each of his 26.75 years is decreased to *1.382%* of his pay.
Ms. Leutloff's benefits are backloaded even more because she was hired at age 19.

55.     It is basic and indisputable mathematics that the effect of Kinder
Morgan's denominator based on "projected" service with no maximum is
inconsistent based on the employee's age when hired. An employee whose
participation started at age 35 and who worked 26.75 years, as Mr. Pedersen did,
will have an accrual rate of 2% of pay for each year, the same rate as promised in
the normal retirement benefit formula. When a fraction is applied in which a
numerator of 26.75 is divided by a denominator based on a start date at age 35 or
older, the retirement benefit for someone with Mr. Pedersen's "Part 1" benefit will
be $3,679.98 per month ($4,127.08 x 26.75/30.00), which equals 2% of pay for
each of his 26.75 years.

56.     Given the ages when participants like Mr. Pedersen and Ms. Leutloff
were hired and the indisputable math of Kinder Morgan's denominator based on
"projected" service, the benefit accruals of people hired before age 35 are
"backloaded" to later years of service. They do not have a 2% of pay accrual rate
after 30 years of service, but instead are subject to a much lower one. Assuming a
participant is hired at age 20 and has the maximum of 30 years, this makes the
accrual rate much lower than 2 percent of final pay, e.g. 2% x 30 /45 = 1.33% and

backload the accrual of the plan's benefits to 45 years, which is a period of 15 additional years to earn the full 2 percent of pay benefit over a maximum of 30 years.

57.     For the non-Coastal El Paso employees and the Coastal employees who commenced participation at or after age 35, the accrual formula is a uniform rate of 2% per year. But for the classification of Coastal employees who commenced participation before age 35, the accrual formula, as Kinder Morgan applies it, is at rates well below 2%. That position is not expressed in the plan's terms and it violates the example in the Treasury regulations on classifications that are "so structured as to evade the accrued benefit requirements."

58.     The revised Coastal fraction is not paralleled by the accrual formula of any other group of employees under the El Paso Plan. The El Paso Pension Plan also provided a 2% of pay benefit formula for non-Coastal employees. That benefit is also computed with a maximum of 30 years of participation and with no intention that the total number of years for purposes of benefit accrual would be computed without regard to the maximum of 30 years.

59.     As discussed above, Kinder Morgan's position is predicated not only on an unlawful reading of ERISA's fractional rule, but on legally significant modifications to the plan language about the denominator of the fraction. As

Exhibit 10.16 to Coastal Corporation's 1993 10-K annual report shows, Section

5.1(c) of the Coastal Plan provided that the denominator for the fraction is:

> "the Years of Service which the Participant would have attained had he
> continued to earn uninterrupted Years of Service until his Normal
> Retirement Age."

This follows plan language providing that the benefit to which this denominator is

applied uses "up to the maximum number of Years of Service specified in the

applicable benefit formula which the Participant *would have attained* had he

continued to earn uninterrupted Years of Service until his Normal Retirement Age

in lieu of his actual Years of Service."  Emph. added.

60.     The Appendix to the El Paso Plan, which is part of the Appendix to the

Kinder Morgan Plan, revised this to provide the benefit is "divided by":

> "the Participant's projected Credited Service determined as if the
> Participant continued to be an Active Participant until his or her
> Normal Retirement Date."

The benefit to which this divisor was applied was also modified to replace "the

Years of Service specified in the applicable benefit formula which the Participant

would have attained" with "the Participant's "projected Credited Service

determined as if the Participant continued to be an active Participant until his or her

Normal Retirement Date (up to a maximum of 30 years and determined without

regard to the March 31, 2006 cut-off for Credited Service referenced above)."

61.    A February 27, 2020 letter from Kinder Morgan's Claims Administrator maintained that the terms of the Appendix "correspond" to the terms of the Coastal Plan and that it is therefore "clear" that the denominator of this fraction "does not include a limit on credited service projected to normal retirement date," and thus allows the plan's benefit accruals under the Plan's 30-year formula to be spread out over as many as 45 years.

62.    An August 31, 2020 letter from Kinder Morgan's Fiduciary Committee makes the same assertion that the terms of the Appendix "correspond" to the terms of the Coastal Plan and that it is "clear" the denominator does not include a limit, e.g., that benefits determined under a formula with a 30 year maximum can be accrued over a period of up to 45 years.

63.    It cannot be disputed that the terms in Section 5.1 of the Coastal Plan are *not* the same as in the El Paso Appendix so that this conclusion is not "clear." Two key differences in the terms are: (1) the phrase  "would have attained" is different than the single word "projected," and (2) "the Years of Service specified in the applicable benefit formula" is different from "projected Credited Service." *Webster's Third New International Dictionary* provides that the word "attain" means to "reach, gain, achieve, or accomplish" whereas the word "projected" may be construed to simply mean that a value is brought forward at some rate without

regard to any conditions or limits on what someone may reach, gain, achieve, or accomplish.

64.    It is also indisputable that the mathematics of Kinder Morgan's interpretation backloads benefit accruals to later years of service for employees like Mr. Pedersen and Ms Leutloff who were hired before age 35. As stated, both Mr. Pedersen and Ms. Leutloff were hired at early ages, age 21 for Mr. Pedersen and age 19 for Ms. Leutloff. Under Kinder Morgan's construction, they are both subjected to rates of accrual of less than 1.4% for each of their years of participation, rather than the 2% that the Coastal Plan's benefit formula promised. And rather than accruing the Coastal Plan's benefits over 30 years, their benefit accruals have been backloaded to a period of up to 45 years.

65.    The IRS has never provided any guidance or examples consistent with Kinder Morgan's construction of the fractional rule. *See, e.g.,* Treas. Reg. 1.411(b)-1(b)(3)(iii) (Examples (1) and (2)). And, as stated, Kinder Morgan's construction also cannot by any stretch of the imagination comply with the "uniformity requirements" in Treas. Reg. 1.401(a)(4)-3(b)(2) for plans that use the fractional rule.

66.    To comply with ERISA's fractional rule, the terms of the Coastal Corporation's Plan must conform with the statutory requirement that the

denominator of the fraction is no more than "the total number of years he would have participated in the plan if he separated at the normal retirement age," which the preceding subsection of the Plan limits to 30 years. The terms of the Coastal Plan clearly can be read to comply with the fractional. But the terms that Kinder Morgan has applied have been substantially revised and then further construed to produce Kinder Morgan's improbable results.

67.    Many defined benefit retirement plans have "unit benefit" formulas with limits on the number of credited years like the Coastal Plan's 2 percent of final pay for each year of participation up to a maximum of 30 years. These are the types of plans IRS Document 6390 refers to as ones that "otherwise satisfy the requirements though they often do not contain specific statutory language." A unit formula with limits on the number of credited years complies with the fractional rule (and with the 133-1/3 percent method)  without any "specific statutory language."

68.    Even though IRS Document 6390 says it did not need to, the Coastal Plan's  accrual formula contained "specific statutory language" saying that the 2 percent of final pay formula is multiplied by a fraction. As discussed above, the Coastal Plan's original language provided that the denominator for the fraction is "the Years of Service which the Participant would have attained had he continued to

earn uninterrupted Years of Service until his Normal Retirement Age." This followed the earlier description that the benefit to which the denominator is applied is calculated with "up to the maximum number of Years of Service specified in the applicable benefit formula which the Participant *would have attained* had he continued to earn uninterrupted Years of Service until his Normal Retirement Age in lieu of his actual Years of Service."

69.     The language about "the Years of Service which the Participant would have attained had he continued ... until his Normal Retirement Age" was close to the statutory language in ERISA §204(b)(1)(C), 29 U.S.C. 1054(b)(1)(C), which provides that the denominator is "the total number of years he would have participated in the plan if he separated from service at the normal retirement age." There was no indication in the Coastal Plan language of an intent that "the total number of years he would have participated in the plan" would be computed without regard to the "number of Years of Service specified in the applicable benefit formula."

70.     Neither the original nor the revised plan language required El Paso or Kinder Morgan to use a different number of years of service than appears in the normal retirement benefit formula. To use the fractional rule when the normal retirement benefit is a unit benefit formula, the years of participation in the fraction

34

can simply use the same definition of years that is used in the normal retirement benefit formula, including any 30 year maximum.

71.    Two additional contextual points weigh against Kinder Morgan's construction:

(A)    When El Paso adopted the 5-year Coastal Transition Benefit effective April 1, 2001, no examples were provided to the Coastal employees showing how the 5-year transition benefit would be decreased by the fractions Kinder Morgan now describes as "clear." The fractions that Kinder Morgan says are "clear" would mean the additional 5 years of benefits is only worth 66-2/3% for an employee who commenced participation at age 20. For example, 5 years x 2% of pay = 10% of pay. But  after a fraction of 30/45 is applied, the 10% of pay benefit is reduced to 6.66% (5 years x 1.33%). This is a very substantial limitation to the Coastal Transition Benefit never to have been disclosed, explained or illustrated. Providing the full 2% per year for the 5 year Transition is the only logical and reasonable interpretation of the promised "Five-Year Coastal Transition Benefit."

(B)    The "without regard to the March 31, 2006 cutoff for Credited Service" clause in the Coastal Transition Benefit suggests that a second "without regard to" is not just to be implied into the denominator with no comparable expression. The "surplusage canon" establishes "the presumption that each word ...

is there for a reason." *See, e.g.*, *Advocate Health Care Network v. Stapleton*, 137 S.Ct. 1652, 1659 (2017). But instead of following this principle, Kinder Morgan infers the presence of a second "without regard to" from its absence, thus inferring that the Coastal Plan "does not include a limit on credited service projected to normal retirement age" because of the absence of a contrary specification in Section 5.1(c) of the Coastal Plan.

72.     Kinder Morgan's position that the El Paso/Coastal Appendix to the Plan should be construed in its favor also ignores that its construction does not comply with the "uniformity requirements" in the Treasury regulations and is thereby inconsistent with the representation that "the Plan ... is intended to comply with the Internal Revenue Code of 1986, as amended."[2]

---

[2] Consistent with El Paso's Pension Plan, Section 12.12 of Coastal's Plan said:

> "The Plan and Trust are intended to qualify as a Plan and Trust meeting the requirements of Sections 401(a) and 501(a) of the Code, as now in effect or hereafter amended, so that the income of the Trust Fund may be exempt from taxation under Section 501(a) of the Code and contributions of the Company under the Plan may be deductible for federal income tax purposes under Section 404 of the Code.  Any modification or amendment of the Plan or Trust may be made retroactively, as necessary or appropriate, to establish and maintain such qualification and to meet any requirement of the Code or ERISA."

73.     The Kinder Morgan Claims Administrator's February 27, 2020 letter represented that the Plan's actuaries at Mercer had in December 2019 "confirmed" that the benefit formula, as interpreted by Kinder Morgan, complies with ERISA and the Code. But the 12/2019 memo that was subsequently produced from Kevin Bills at Mercer to Chris Noonan at Kinder Morgan, actually stated that "Mercer is not a law firm and therefore is not permitted to provide legal advice," and also "suggest[s] you [Kinder Morgan] consult with your ERISA attorney on these issues." There is no indication Kinder Morgan consulted with its ERISA attorney on these issues and obtained an opinion letter to back up this position.

74.     The memo from Mercer's Kevin Bills in regards to "the November 5, 2019 letter ... forwarded us from Stephen R. Bruce" further shows that Mercer had never considered how this construction of the accrual formula complies, and had no backup to support it. There was, for example, no mention in it of the Treasury Department's "uniformity requirements," the 2001 revision to the language about the denominator, or the application of the "anti-cutback" rule to that amendment.

75.     According to the Form 5500's for the Coastal and El Paso Plans, Mercer did not have any responsibilities with regard to the Coastal Plan before 2001, so Mercer necessarily lacks personal knowledge with regard to the development or application of the formula before that date.

76.     Defendants were asked for this fax and all communications between Kevin Bills of Mercer and El Paso or Kinder Morgan related it or to the illustration of the fractional rule examples prepared on 8/5/2020 that are referenced on pages 3 and 6 of the Fiduciary Committee's August 31, 2020 letter. The Claims Administrator and the Fiduciary Committee produced nothing.

77.     In an earlier effort to support Kinder Morgan's position, the Kinder Morgan Claims Administrator's February 27, 2020 letter touted "favorable determination letters" issued by the IRS "that the terms of ... the El Paso Plan, including the Coastal Transition Benefit formula, conform to the requirements of Code Section 401(a)." But the IRS unmistakably informed both El Paso and Kinder Morgan: "Our favorable determination applies only to the status of your plan under the Internal Revenue Code (IRC)," and not to ERISA.

78.     The Fiduciary Committee's August  31, 2020, letter further represented that the Plan "has passed applicable nondiscrimination testing" under the IRC "at all relevant times using the general test" for nondiscrimination. But when the El Paso Corporation submitted an Application for Determination to the IRS in 2002, and asked that the determination letter apply to the Coastal Plan because it "was merged into the Plan effective April 1, 2001," El Paso gave an unequivocal "No" in response to a question about whether it was requesting a determination regarding

the "nondiscrimination safe harbors," which include the "uniformity requirements," and it submitted no demonstration of how the Coastal Plan's accrual formula "has passed" the "general test" for nondiscrimination.

79.   In response to a request for all communications in which the Chairman, the Fiduciary Committee, or anyone acting on their behalf was told the El Paso Plan complied with the "general test" for nondiscrimination, the Fiduciary Committee also produced nothing. Now, the Fiduciary Committee says there were only "oral representations of the Plan's actuaries that ... the El Paso Plan passed the applicable nondiscrimination testing."

80.   The Fiduciary Committee was also asked for all of the favorable determination letters referenced on page 6 of the August 31, 2020 denial letter. The determination letters that were produced all show the IRS's express instruction that the plan sponsor must "keep ... the application forms submitted ... and all correspondence with the Internal Revenue Service regarding [the] application ... to preserve your reliance on [the favorable determination] letter." Now the Fiduciary Committee takes the position that the "[f]avorable determination letters for the Plan are not 'relevant' to Mr. Pedersen's claim."

81.   The only place any description of a benefit accrual "denominator" that was not limited to the 30 years of credited service has been found was in a July

2000 Summary Plan Description for the Coastal Pension Plan, which said the years in both the numerator and the denominator will be "with no maximum number of years." Six *subsequent* SPDs failed to repeat this language, or to provide any examples. Thus, the statement that the denominator is "with no maximum number of years" was not included in any of El Paso's four subsequent SPDs in 2002, 2004, 2006, or 2011, or in Kinder Morgan's 2017 and 2018 SPDs.

82.     The Fiduciary Committee's August 31, 2020 denial letter attached a new "SPD Language Chart" which contains excerpts from various summary plan descriptions in the years 2000, 2004 (one in July and one in August), 2006, 2017, and 2018. But that chart confirms that the only one of those excerpts which shows a denominator greater then 30 or 33 1/3 years is the July 2000 SPD.

83.     The July 2000 SPD said the actual years in the numerator and the projected years in the denominator were "with no maximum number of years." But the Plan document has never contained any language saying the denominator will be "with no maximum number of years." *Cigna Corp. v. Amara*, 563 U.S. 421, 436 (2011), holds that the terms of an ERISA plan cannot be amended by the description found in an SPD, much less by a one-time description that was not repeated in *six* subsequent SPDs.

84.     Even if an SPD is not directly inconsistent with the plan, "ambiguous plan language" should "be given a meaning as close as possible to what is said in the plan summary." *Koehler v. Aetna Health Inc.*, 683 F.3d 182, 189 (5th Cir. 2012) ("even if the plan's language unambiguously supports the administrator's decision, a beneficiary may still seek to hold the administrator to conflicting terms in the plan summary through a breach-of-fiduciary-duty claim" under ERISA §502(a)(3)). These inferences require the Plan's provision to be read to mean that "the years he would have participated in the plan" is limited to the maximum number of years of participation that the plan's normal retirement benefit formula credits.

### Claim II

### Violation of ERISA's Anti-Cutback Rule for Accrued Benefits

85.     The "anti-cutback" protection in ERISA §204(g)(1), 29 U.S.C. 1054(g)(1), provides that the "accrued benefit" of an employee participating in a company retirement plan like El Paso's "may not be decreased by an amendment of the plan."

86.     In *Kifafi v. Hilton Hotels*, 616 F.Supp.2d 7, 25-26 (D.D.C. 2009), *aff'd*, 701 F.3d 718 (D.C. Cir. 2012), a plan amendment to comply with ERISA's fractional rule violated ERISA when the amended fraction caused the plan's "2% of pay per year" retirement benefit to be decreased by accruing it under the fractional

rule but "only" after making "two changes" to the plan's benefit formula that unnecessarily reduced benefits.

87.     For purposes of the anti-cutback rule, a "reinterpretation" of plan terms that decreases the accrued benefit is treated as "an amendment of the plan." *See, e.g.*, *Cottillion v. United Refining Co.*, 781 F.3d 47, 55 (3d Cir. 2015); *Johnston v. Dow Emples. Pension Plan*, 703 Fed. Appx. 397, 407-8 (6th Cir. July 19, 2017).

88.     In this case, as Exhibit 10.16 to Coastal Corporation's 1993 10-K annual report shows, Section 5.1(c) of the Coastal Plan provided that the denominator for the fraction is:

> "the Years of Service which the Participant would have attained had he continued to earn uninterrupted Years of Service until his Normal Retirement Age."

This came after plan language providing that the benefit to which this denominator is applied uses "up to the maximum number of Years of Service specified in the applicable benefit formula which the Participant *would have attained* had he continued to earn uninterrupted Years of Service until his Normal Retirement Age in lieu of his actual Years of Service."  Emph. added.

89.     The Appendix to the El Paso Plan, which is a part of the Appendix to the Kinder Morgan Plan, amended this in March 2001 to provide the benefit is "divided by":

"the Participant's projected Credited Service determined as if the Participant continued to be an Active Participant until his or her Normal Retirement Date."

The benefit to which this divisor is applied was also modified to replace "the Years of Service specified in the applicable benefit formula which the Participant would have attained" with "the Participant's "projected Credited Service determined as if the Participant continued to be an active Participant until his or her Normal Retirement Date (up to a maximum of 30 years and determined without regard to the March 31, 2006 cut-off for Credited Service referenced above)."

90.     It cannot be disputed that the terms in Section 5.1 of the Coastal Plan are *not* the same as in the El Paso Appendix. Two key differences in the terms are: (1) the phrase  "would have attained" is different than the single word "projected," and (2) "the Years of Service specified in the applicable benefit formula" is different from "projected Credited Service." *Webster's Third New International Dictionary* provides that the word "attain" means to "reach, gain, achieve, or accomplish" whereas the word "projected" may be construed to simply bring a value forward at some rate without regard to any limits on what someone may reach, gain, achieve, or accomplish.

91.     The revision to the plan language related to the denominator of the fraction for Plan's benefit accruals violated not only the command in ERISA's

43

fractional rule that the denominator "is the total number of years he would have participated in the plan if he separated from service at the normal retirement age," but the revision also violated ERISA's "anti-cutback" rule by decreasing the accrued benefit.

92.     As in *Kifafi*, El Paso's amendment to the fraction cannot be fixed by changing the denominator back to the original provision, but making other changes to the fraction to achieve similar results.

## Claim III

## Violations of ERISA's Disclosure Requirements

93.     Defendants' position on the construction of the denominator to the Plan's accrual formula also leads to a violation of ERISA's disclosure rules. ERISA §102(a), 29 U.S.C. 1022(a), requires disclosures of the plan's terms "written in a manner calculated to be understood by the average plan participant." *See also* 29 C.F.R. 2520.102-2(a).

94.     No participant, not even the executives who were covered by this plan, could understand from the El Paso or Kinder Morgan SPDs that for employees hired before age 35, the rate of benefit accrual was far less than 2% per year, even though the plan's benefit formula promised 2% per year of final average monthly earnings.

44

95.     A November 10, 2000 fax from Mercer to El Paso, referenced on pages 3 and 5 of the Fiduciary Committee's August 31, 2020 denial letter, shows that several months after the July 2000 SPD, the issue of whether the denominator of the fraction was limited to 30 or 33-1/3 years arose internally. El Paso asked its actuaries about whether the denominator of the Coastal Plan's accrual fraction was 30 or 33-1/3. This question shows that it was ambiguous within El Paso's executive ranks. The answer according to the single page document produced by Kinder Morgan was a one-word handwritten "No."  No further explanation was offered, and no disclosure of this question or answer was provided to the participants whose benefits would be substantially decreased if this was the answer. In fact, the SPDs issued after this changed the SPD language to eliminate any disclosures about how the fraction worked.

96.     Whether the plan provisions are "clear" or ambiguous, ERISA requires understandable disclosures of how the Plan is actually being operated. SPDs cannot "render obscure" or "minimize" "[a]ny description of exception, limitations, reductions, and other restrictions of plan benefits" and for pension and welfare benefit plans, the SPD must "clearly identify[] circumstances which may result in ... loss, forfeiture, suspension, offset, [or] reduction ... of any benefits that a participant

45

or beneficiary might otherwise reasonably expect the plan to provide on the basis of the description of benefits ...." 29 C.F.R. 2520.102-2(b); 2520.102-3(l).

97.    The ERISA §204(h) notices of significant reductions in the rate of future benefit accrual, such as the 2007 "Notice to Certain Participants and Alternate Payees Regarding the El Paso Corporation Pension Plan," are likewise subject to the requirement of being "written in a manner calculated to be understood by the average plan participant," including being calculated to understandably disclose reductions that "affect different classes of participants differently." ERISA §204(h)(2); Treas. Reg. 54.4980F-1, Q&A-6 and 11.

98.    Whether the terms of the plan documents are "clear" or ambiguous, ERISA affirmatively requires understandable disclosure of the reductions or restrictions in the Plan's benefits. *See Pearce v. Chrysler Grp. LLC Pension Plan*, 893 F.3d 339, 347-48 (6th Cir. 2018) (when SPD "misleadingly omitted" exclusion of terminated vested participants from 30 and out retirement benefits, "inequitable conduct," not "intent to deceive," is required for equitable relief).

99.    It is obviously confusing for an "average plan participant" to be told that his or her retirement benefit is a 2% of final pay benefit up to a maximum of 30 years, when the years over which that benefit accrues can be as many as 45 years, such that the actual annual rate of accrual is decreased to as low as 1.33% per year.

46

Plan participants look to the summary plan description (SPD) for an explanation of any such features. It is doubly confusing to the "average plan participant" when this lower fractional accrual rate only applies to participants who commence participation before age 35, which is an arbitrary classification.

100.   The 2002 to 2011 SPDs for the El Paso Plan do not disclose any circumstances in which the 2% per year benefit for the Coastal employees may be reduced to a lower accrual rate by counting years in the denominator which are more than the "total number of years he would have participated in the plan if he separated at the normal retirement age." The February 27, 2020 letter from the Kinder Morgan Claims Administrator disavows those SPDs on the basis that "the terms of these plans are clear."

101.   A SPD language chart prepared by Kinder Morgan in August 2020 also fails to show any disclosures of this, except for in the July 2000 Coastal Corporation SPD.

102.   When asked to see the November 10, 2000 fax to which this page was attached, the Fiduciary Committee refused to produce it as not "relevant."

**Claim IV**

**Violation of ERISA's Anti-Cutback Protection for Early Retirement Benefits**

103.   ERISA §204(g) protects pension plan participants from amendments

that decrease their accrued benefits. In 1984, Congress added ERISA §204(g)(2), 29

U.S.C. 1054(g)(2) to ERISA's anti-cutback protection as part of the Retirement

Equity Act because courts had interpreted ERISA to only protect normal retirement

benefits from being decreased by plan amendments. *Compare Bencivenga v.*

*Western Pennsylvania Teamsters Pension Plan*, 763 F.2d 574, 578, 580 (3d Cir.

1985), *with Amato v. Western Union Int'l, Inc.*, 773 F.2d 1402, 1414 (2d Cir. 1985).

The new subsection provides that a plan amendment that has the effect of

"eliminating or reducing an early retirement benefit ... with respect to benefits

attributable to service before the amendment shall be treated as reducing accrued

benefits." As amended, the "anti-cutback" rule "prohibit[s] employers from

amending their plans to eliminate or decrease early retirement benefits or

retirement-type subsidies." *Costantino v. TRW*, 13 F.3d 969, 977-78 (6th Cir. 1994).

104.   The terms of ERISA §204(g)(2) and now-Justice Alito's concurring

opinion in *Gillis v. Hoechst Celanese Corp.*, 4 F.3d 1137, 1150 (3d Cir. 1993), *cert.*

*denied*, 511 U.S. 1104 (2001), show that the new statutory protection extends to any

participant who "satisfies (either before or after the amendment) the preamendment conditions for the [early retirement] subsidy."

105.   Under ERISA §204(g)(2), a participant who is not eligible for early retirement at the time of an amendment thus must be allowed to "grow into" eligibility for the early retirement benefits under the preamendment terms of the plan. *See Alcantara v. Bakery & Confectionary Union & Indus. Int'l Pension Fund*, 751 F.3d 71, 78 (2d Cir. 2014); *Bellas v. CBS, Inc.*, 221 F.3d 517, 527 (3d Cir. 2000), *cert. denied*, 531 U.S. 1104 (2001); Revenue Ruling 85-6 (January 1985).

106.   In *Gillis*, 4 F.3d at 1147, the Third Circuit held that "an employee is not separated from service if the employee continues on in the same job for a successor employer."

107.   The protection against cutbacks of early retirement benefits by plan amendments even encompasses an amendment to terminate the plan. Even when an amendment to terminate a plan is adopted, the plan participants are required to have the opportunity to grow into early retirement eligibility. The Treasury regulations at 1.411(d)-4 issued in 1988 provide two examples on how the anti-cutback protection applies on a "plan termination." 1.411(d)-4(a)(2)(ii)(B) (Example 1) ("In January 1990, the employer decides to terminate the plan as of July 1, 1990. The plan will fail to satisfy section 411(d)(6) unless the optional forms of benefit provided under

the plan are preserved under the annuity contract purchased on plan termination"),

and 1.411(d)-4(a)(3) (iv)(Example 2) ("Because employees W and Z have not

selected an optional form of benefit, they continue to have a 411(d)(6) protected

right to the full array of section 411(d)(6) protected benefits provided under the

plan, including ... the subsidized early retirement benefit").

108.    In Revenue Ruling 85-6, the IRS likewise described how the anti-

cutback protection may not be eliminated on a plan termination:

> "The right of a participant under the plan to immediate payment without
> actuarial reduction, if age 55 with 30 years of service, is both a
> retirement-type subsidy subject to section 411 (d) (6) (B) of the Code and a
> liability for purposes of section 401 (a) (2). A participant could, after the date
> of the proposed termination, satisfy the pretermination conditions necessary
> to receive this retirement-type subsidy. Accordingly, the proposed
> termination eliminating this accrued retirement-type subsidy would result in
> the plan failing to satisfy the vesting requirements of section 411."

109.    In this case, Section 3.2 of El Paso's Retirement Plan, and through

merger the Kinder Morgan Retirement Plan, provides that an employee will become

early retirement eligible if he "terminates employment after attaining age 55 and

completing ten (10) Years of Service." ANR was named in the El Paso Plan,

including the Ninth Amendment, as an employer with whom service counts for

early retirement eligibility.

110.   In a Fall 2005 presentation to employees of the Coastal Corporation and its subsidiaries, that was conducted at Farmington Hills, MI, where Mr. Pedersen attended, and Tinley Park, IL, where Ms. Leutloff attended, the El Paso Corporation recognized the Coastal employees' right to "grow into" early retirement eligibility, telling them that while the Coastal Transition Benefit was a Frozen Benefit":

> "After 3/31/06 you will still be able to grow through Age and Service to Early Retirement eligibility ... [including] More favorable reduction factors (4% per year preceding age 62)"

The Fall 2005 presentation gave an example on the next page where by continuing to work to age 55, a participant with "Frozen Age 65 Benefit = $858" becomes eligible for a retirement benefit of $618 per month at age 55, which is only a 28% reduction from the age 65 benefit ($858 times 72% = $618 per month).

111.   Under Section 3.2, ANR employees like Mr. Pedersen and Ms. Leutloff "terminate employment" only when they separate from service from ANR. Mr. Pedersen and Ms. Leutloff continued to work for ANR past age 55. Mr. Pedersen continued to work for ANR until age 58, and Beverly Leutloff continues to work there at age 62.

112.   Mr. Pedersen's and Ms. Leutloff's employment with ANR did not terminate on El Paso's sale of ANR in February 2007. Indeed, the sales agreement

between El Paso and TransCanada states expressly that the ANR Pipeline employees will be "encouraged" to continue to be ANR Pipeline employees and that El Paso is prohibited from soliciting them to become employees of any other unit of El Paso.

113.   The only option to allowing these participants to "grow into" eligibility for early retirement eligibility was to treat them as early retirement eligible as of the sale date. *See* Revenue Ruling 85-6, 1985 IRB LEXIS 389, at *6.

114.   The sales agreement between El Paso and TransCanada further provided that the ANR Pipeline employee would be "entitled to a distribution from the [El Paso Corporation] Cash Balance Plan as provided under the terms of the Cash Balance Plan as soon as practicable after the Closing." The terms of the Cash Balance Plan include the El Paso and Coastal Transition Benefits at early retirement age.

115.   By the time the ANR subsidiary was sold in 2007, no one with Coastal, including the ANR subsidiary, was continuing to accrue additional benefits. The end of the five-year transition period for the Coastal Transition Benefit under the Seventh Amendment to the El Paso Plan was March 31, 2006. Thus, even if ANR Pipeline had not been sold to TransCanada in 2007, participation under the traditional defined benefit plan had stopped. The only purposes for which

52

employment with ANR Pipeline, Coastal, or El Paso continued to count was for early retirement eligibility.

116.   ERISA's anti-cutback rule required the El Paso Retirement Plan and by merger the Kinder Morgan Retirement Plan to allow Mr. Pedersen and other ANR employees to "grow into" early retirement eligibility based on continuing service with ANR and its successors even after ANR was sold to TransCanada at the end of February 2007.

117.   Pursuant to ERISA §204(g)(2), Section 3.2's early retirement provision must continue to apply even after El Paso sold ANR to TransCanada on February 22, 2007.

118.   Because the anti-cutback protection applies on plan terminations, it must also apply when the participation of one affiliated company like ANR Pipeline is terminated from the plan.

119.   Effective March 1, 2007, El Paso nevertheless adopted the "Ninth Amendment" which purported to amend the Plan's early retirement requirement to provide that only those ANR employees who were age 53 or more on the date of the sale could be eligible for early retirement. Under the Ninth Amendment, employees like Ms. Leutloff and Pedersen, who were ages 48 and 49, respectively, in March

2007, could not grow into eligibility, even if they continued to work for ANR after the sale past age 55.

120.   On its face, the Ninth Amendment stopped the counting of service for early retirement benefits for ANR employees after the date of its adoption. If El Paso had the authority to amend the Plan to discontinue growing into early retirement eligibility for ANR employees, with an exception for those who were age 53, it obviously had the authority to do so for employees who were age 49 but chose not to exercise it.

121.   With the exception of the ANR employees, it is undisputed that the El Paso Corporation employees, including employees of other subsidiaries of Coastal Corporation like ANR, should be continuing to grow into early retirement eligibility.

122.   The "detailed" calculation that Kinder Morgan provided on October 11, 2019 says Mr. Pedersen "terminated before obtaining early retirement eligibility" and is entitled only to a "Vested Termination Benefit." As stated, however, ERISA requires that former ANR employees like Mr. Pedersen be permitted to "grow into" early retirement eligibility if they continued to work with ANR until age 55. Mr. Pedersen continued to work there until age 58.

123.   Under ERISA §204(g)(2), the Ninth Amendment that El Paso adopted effective March 1, 2007 was an amendment that eliminated or reduced early retirement benefits from which participants are to be protected. And as stated, the statutory protection allows participants to "grow into" eligibility by "satisf[ying]... the pre-amendment conditions for the subsidy" after the amendment, including the age and service requirements.

124.   In this case, the Plan document named ANR as an "Affiliated Company" for whom employment counted for early retirement eligibility. After the sale to TransCanada, ANR continued to exist and to employ Mr. Pedersen and Ms. Leutloff. As a result, Mr. Pedersen, Ms. Leutloff, and other ANR employees had to be allowed to continue to satisfy the pre-amendment conditions for the subsidy after the Ninth Amendment by continuing to work for ANR until age 55.

125.   Except for the Ninth Amendment, the ANR employees would have been allowed to continue to satisfy the pre-amendment conditions for the subsidy by growing into eligibility for early retirement benefits. Those early retirement benefits were not additional accruals, which had already stopped in 2006, but were for benefits already earned.

126.   Kinder Morgan's application of El Paso's "Ninth Amendment" to cut off Mr. Pedersen's ability to "grow into" early retirement eligibility with continuing

ANR employment violates the anti-cutback protection in ERISA §204(g)(2), 29 U.S.C. 1054(g)(2). Because that anti-cutback protection is also set forth in Section 3.2 of the Plan, Kinder Morgan violated that plan provision, too.

127.   The Kinder Morgan Claims Administrator's February 27, 2020 letter professed that the Ninth Amendment was merely "to clarify the procedures for becoming and ceasing to be a participating employer in the plan." However, in the next paragraph, the Administrator acknowledges that "[t]he [2007] Notice specifically addresses that the amendment may reduce future accruals under the Plan." Thus, the Claims Administrator concedes that the 2007 Notice said there was an "amendment" and that it said nothing about clarification.

128.   Mr. Pedersen's counsel asked for any communications, including from counsel, in which the Fiduciary Committee's Chairman or the Fiduciary Committee were advised, as stated on page 7 of the August 31, 2020 letter, that the Ninth Amendment is *not* an amendment to pre-amendment conditions for purposes of ERISA's anti-cutback rule. The Chairman and the Committee produced no further communications.

129.   The Administrator's February 27, 2020 letter asserted that ERISA §204(g)(2)'s anti-cutback protection "does not prohibit an employer from terminating employees, either individually or in connection with the sale of a

subsidiary." However, as stated above, "the sale of a subsidiary" is not the same as "terminating employees." Here, the sales agreement between El Paso and TransCanada expressly provides that employment with ANR Pipeline will continue after the acquisition, affirmatively "encouraged" employees to continue with TransCanada, and prohibited El Paso from interfering with that employment relationship.

130.   The Kinder Morgan Claims Administrator's February 27, 2020 letter ignores the statutory protection for any participant who "satisfies (either before or after the amendment) the preamendment conditions for the [early retirement] subsidy." Rather than address the statutory language, the Claims Administrator relied on a 1990 General Counsel Memorandum ("GCM"). However, that GCM is about a different subject and a different statutory section. That GCM is about the permissibility of distributions under IRC §401(a) after a sale or other disposition. It does not relate to the issue of "growing into" early retirement eligibility by satisfying the pre-amendment conditions for early retirement under ERISA. As explained in *Gillis*, which was decided three years *after* this GCM, growing into eligibility for early retirement under the protection of ERISA §204(g)(2) is not the same as making a distribution under IRC §401(a). The GCM on which the Claims Administrator relies does not deal with the statutory issue of "satisf[ying] the pre-

amendment conditions for the subsidy." The GCM also does not take into account that ERISA's definition of the "employer" is based on "economic realities," and not on corporate controlled group formalities like whether or not an employee is now part of a different corporate group.

131.   The Claims Administrator's February 27, 2020 letter alternatively suggests that the Ninth Amendment's reduction of early retirement benefits for ANR employees like Mr. Pedersen might not be a violation because another part of the same amendment "expanded" eligibility for participants who were age 53 as of the date of the sale.

132.   Under Treasury regulations that became effective on August 12, 2005, *see* 70 Fed. Reg. 47109, if there are "two amendments with the same applicable amendment date," the amendments violate the anti-cutback rule when "the net dollar amount of any early retirement annuity with respect to the accrued benefit of any participant is lower than it would have been without the two amendments." Treas. Reg. 1.411(d)-3 (b)(iii).

133.   In this case, Mr. Pedersen's early retirement annuity is "lower than it would have been without the two amendments" because the amendment related to participants who are age 53 as of the date of the sale did not "expand" his eligibility for early retirement benefits, but the amendment related to ANR decreased the

factors used to determine his early retirement annuity, even after he satisfied the "pre-amendment conditions" for the benefit.

## Claim V

### Violation of Plan Terms and Fiduciary Duties in Denying Benefits That Are "Unreduced at Age 62 for ANR Participants"

134.   Even if Mr. Pedersen and Ms. Leutloff were held to be eligible only for a vested termination benefit, Sections 4.1(c)(iv) and 4.3(c) of the El Paso Pension Plan provide that they are eligible for a retirement benefit at age 62 that is "unreduced" or 100% of the benefit at age 65.

135.   However, instead of providing an "unreduced" benefit at age 62, Kinder Morgan's calculations applied a "Vested Terminated Reduction Factor" of "0.7142" to Mr. Pedersen's and Ms. Leutloff's benefit at age 62, rather than provide the "unreduced" 100% benefit due them at that age.

136.   Mr. Pedersen went ahead and retired at age 62 anyway leaving recovery of the payments necessary to bring his benefits up to an "unreduced" level to this case. For Ms. Leutloff, Kinder Morgan's reduction at age 62 was so excessive that she declined to retire leaving it to this litigation to secure the "unreduced" back and future benefits for her.

137.   Mr. Pedersen and Ms. Leutloff and all others similarly situated are entitled to an "unreduced" retirement benefit at age 62 pursuant to Section 15 of Appendix X of the El Paso Plan. "Appendix X" sets out provisions applicable to participants who were employees of the Coastal Corporation on January 28, 2001, and were employees of ANR Pipeline prior to December 1, 1986.

138.   Section 15 of Appendix X, which appears as Appendix LX of the Kinder Morgan Retirement Plan, added Section 4.1(c)(iv) which is entitled "ANR Grandfather." This Section provides that for "a Participant who was an employee of a participating employer in the [ANR Plan] prior to December 1, 1986," the benefit "shall be the amount determined under Section 4.1(c)(i) [the "Coastal Transition Benefit"] plus the amount equal to 0.3% of Final Average Monthly Earnings multiplied by years of credited service under the ANR Plan prior to 1986.

139.   This ANR grandfathered benefit is subject only to the early retirement reduction in Section 4.3(c) or the Vested Termination Benefit reduction in Section 4.5(c), whichever applies, *in the event benefits commence prior to age 62*." There is *no* reduction if benefits commence at or after age 62. And this provision was not modified by El Paso's "Ninth Amendment," or by any subsequent amendment. The Ninth Amendment modified Section 3.2 on "Early Retirement Date"; it did not modify the other provisions in Appendix X.

60

140.   Consistent with the terms of Section 15 in Appendix X, El Paso and later Kinder Morgan interpreted these Plan provisions from 2005 forward to provide an "unreduced" 100% benefit at age 62 for former ANR employees like Curtis Pedersen and Beverly Leutloff.

141.   The Fall 2005 presentation for Coastal employees that Ms. Leutloff and Mr. Pedersen attended plainly stated that retirement benefits would be:

*\* Unreduced at age 62 for ANR participants employed as of 12/1/86*

142.   A February 20, 2007 email from Norma Ortega, the El Paso Plan's benefit specialist, likewise stated that the Coastal transition benefit at age 62 is "unreduced":

> "in regards to eligible ANR participants (that were [participants] of that plan 12/1/86) that terminate as term[inated] vested employees (before age 55)...they will be able to receive their unreduced age 65 benefit at age 62. However, if you choose to take your benefit prior to age 62...your benefit will be actuarially reduced (since you terminated as a vested employee vs retirement eligible)...but if you wait until age 62 you can receive your unreduced age 65 (frozen) benefit at that time."

142A. Norma Ortega's response followed a letter/ERISA Section 204(h) notice that El Paso sent on or about February 14, 2007 describing how early retirement pensions would be handled in conjunction with El Paso's sale of ANR to

TransCanada. ECF No. 17-10 (Defs Ex. I). After receiving that 204(h) notice, Michael T. Chio, a regional HR representative, who resides in Wixom, Michigan, and David H. Coker, a pipeline services engineer who worked at Tinley Park, IL, sent separate sent emails on February 19, 2007 on behalf of themselves and others, including Curtis Pedersen, Beverly Leutloff, and Heather Holland, another HR representative from Tinley Park, to "Please confirm that if I do not take distribution of my retirement benefits until age 62 that they will not be reduced from the 100% Age 65 annuity" and will I "have to wait 3 years longer than expected (from age 62 to 65) to begin my pension at full value?" Ms. Ortega responded that "The 204(h) [notice] is not addressing specific grandfathered formula provisions" and that under those grandfathered formula provisions, "eligible ANR participants that terminate as term vested employees (before age 55) ... will be able to receive their unreduced age 65 benefit at age 62...."

142C. After the communication from Ms. Ortega, unreduced benefits at age 62 were, in fact, provided to former ANR employees from 2007 to mid-2018 (and are still being provided to former employees who became "annuitants" before some date in 2018 that Defendants have not yet specified). Kinder Morgan now acts as if this was all an "error" in a "pension estimation tool," and not a change in the interpretation of plan language applicable to grandfathered ANR participants.

142D. The partial grant of benefits under the "ANR Grandfather" by Kinder

Morgan's Claims Administrator on February 27, 2020 in response to Mr.

Pedersen's claims was the first recognition by Kinder Morgan of the existence of

the "ANR Grandfather" provision in the "Coastal Appendix," which had been in

place since 2001. Confronted with this provision in February 2020, after Kinder

Morgan had already taken the position that the unreduced benefits were an "error,"

Kinder Morgan interpreted the provision so that it would still not provide the full

unreduced benefits promised in the Fall 2005 presentations, the February 20, 2007

emails from El Paso, the pension calculations provided on request from 2007

through 2018, and the actual payments made to annuitants who retired from 2007

through mid-2018.

143.   The 2016 TransCanada USA Services Retirement Plan SPD also

describes "Your Coastal Transition Benefit," with illustrations on pages 8-12 and,

on page 14, states that "You will receive this percentage of your benefit," showing

"100%" for a "Benefit Start Date" at Age 62, with the Coastal Transition Benefit

reduced by "4% per year" only if "your benefit commencement date precedes ...

your 62nd birthday."  There was no disclosure of an actuarially reduced benefit at

age 62 for any ANR participants.

144.    Since 2007, Mr. Pedersen, Ms. Leutloff  and others obtained innumerable benefit projections from Mercer's online calculator showing they are entitled to an unreduced benefit if payments begin at or after age 62. These calculations constituted the benefit statements required by ERISA §105, 29 U.S.C. 1025. *See, e.g., Bafford v. Northrop Grumman*, 994 F.3d 1020, 1029-30 (9th Cir. 2021); 29 C.F.R. 2520.102-3(t)(2).

145.    Until January 2019, Kinder Morgan was not just providing projections showing unreduced retirement benefits at age 62, but it was also paying these unreduced retirement benefits to all former ANR employees who were similarly situated to Mr. Pedersen and Ms. Leutloff. Kinder Morgan admits, moreover, that it is continuing to pay those unreduced retirement benefits to former ANR employees who commenced their annuities before some date in 2018, which has not been disclosed.

146.    Before Mr. Pedersen brought this up, Kinder Morgan had denied that there was any provision for unreduced benefits at age 62. Now, Kinder Morgan concedes that Section 15 of the Appendix L-X to the Kinder Morgan Retirement Plan provides that his benefit "shall be the amount determined under Section 4.1(c)(i) [the "Coastal Transition Benefit"] plus the amount equal to 0.3% of Final Average Monthly Earnings multiplied by years of credited service under the ANR

Plan prior to 1986" and that "[t]his additional ANR grandfathered benefit is subject to the early retirement reduction in Section 4.3(c) or the Vested Termination Benefit Reduction in Section 4.5(c), whichever applies, in the event benefits commence prior to age 62."

147.   The plain language of Section 15 requires that there will be no early retirement reduction prior to age 62 for any participant "who was an employee of a participating employer in the [ANR Plan] prior to December 1, 1986." This plan provision applies to the amount determined under Section 4.1(c)(i), which is the Coastal Transition Amount, plus the amount equal to 0.3% of final average earnings multiplied by years of service under the ANR Plan prior to 1986. The Appendix to Kinder Morgan's Plan says "[t]his additional ANR grandfathered benefit is subject to the early retirement reduction in Section 4.3(c) or the Vested Termination reduction in Section 4.5(c), whichever applies, in the event benefits commence prior to age 62." There is no reduction for commencing benefits at age 62.

148.   But after Defendants failed to recognize that this ANR Grandfather provision existed, they have attempted to construe it to be limited to the 0.3% portion of the grandfathered ANR benefit. Defendants have never explained how they can limit the grandfather to one portion of the stated benefit. The promise that

the retirement benefits of ANR employees prior to December 1, 1986 would be "unreduced" has no such limitation in Appendix L-X.

149.   After the Fiduciary Committee said it "looked at the slide presentation from 2005 to understand how the ANR Grandfathered benefit was historically interpreted," the Fiduciary Committee said in a January 28, 2021 letter that the "presentation slides provided to employees in 2005 did not amend or modify the terms of Appendix X to the El Paso Plan in effect at that time." The Fiduciary Committee never addressed how the grandfathered provision for an unreduced benefit at age 62 can be construed to apply to only one portion of the benefit consistent with that Section, the Fall 2005 presentation, or El Paso's February 20, 2007 emails, none of which contains any such limit.

150.   In the August 31, 2020 denial letter, the Kinder Morgan Fiduciary Committee asserted that the pension estimation tool and the pension estimates produced prior to March 31, 2018 showing unreduced annuity benefits at age 62 for ANR participants employed as of 12/1/86 were based on an "error." This was a over 12 years after El Paso had first represented to the ANR participants that their retirement benefits were "unreduced" at age 62. And not a single document has been produced showing that this representation was an "error."

66

151.    The Fiduciary Committee never responded to the point that the supposed "error" conforms not only with the terms of Section 15, but also with the Fall 2005 presentations to employees that their retirement benefits would be "Unreduced at age 62 for ANR participants employed as of 12/1/86."  The Fall 2005 presentations and El Paso's February 20, 2007 emails undermine the position that there was simply an "error" in the "online pension estimate tool" that Kinder Morgan discovered 13 years later the fact.

152.    The "favorable compliance statement" issued by the IRS on April 3, 2020 was in response to an "application" that Kinder Morgan submitted to the IRS "to approve a retroactive amendment to change the Plan terms to continue to provide [certain Kinder Morgan Retirement Plan participants] with an "annuity benefit [that] was greater than the plan called for because of a calculation error." The statement that this was "because of a calculation error" is only as good as the representations on which it is based and not a single document has been produced to support it.

153.    The letter Kinder Morgan sent on April 22, 2020 to the annuitants who retired under this "calculation error" says that they are going to be able to keep their monthly benefits unreduced for retirement at age 62, with no refunds or future reductions. But the letter did not state what the dividing line for that protection is.

154.    Mr. Pedersen commenced his benefits on December 1, 2019 and is now an annuitant, and Ms. Leutloff was prepared to become an annuitant on December 1, 2020, but they received no such letter, nor have they nor anyone who was not an annuitant received any explanation about why their benefits are not being protected under the IRS's determination letter if the only error was in an "online pension estimate tool" which they utilized, too.

155.    Counsel for Mr. Pedersen asked for any and all documents, records and other information which relate to the statement that the pension estimates and estimation tool were an "error," or to the statements in the August 31, 2000 letter that the Fall 2005 presentation on the Coastal Transition Benefit stating that benefits are "Unreduced at age 62 for ANR participants employed as of 12/1/86" was "not relevant" to the Coastal Transition Benefit. The Fiduciary Committee produced nothing further.

156.    DOL claims procedure regulations require that records be kept "to verify" that "where appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants," e.g., that the early retirement benefit provisions have been applied consistently.

157.    In response to requests from Mr. Pedersen's counsel, the Administrator and Fiduciary Committee refused to produce the "compliance statement" and the

application made by Kinder Morgan with related papers, even though they are public information under Section 6104 of the Internal Revenue Code.

158.   An inference can be drawn from the absence of any documents showing that this was just an "error" in a website estimation tool and from the refusal to produce the application to the IRS that there is something in the withheld materials that is not helpful to Kinder Morgan's position.

159.   In light of Section 15, the presentations and statements about "unreduced" benefits at age 62 and the payments of unreduced benefits to annuitants for the past 12 years, there is no basis for contending this was just an "error" in coding an online estimation tool.

160.   The fiduciaries for the Kinder Morgan plan have made a number of factual representations about this "error," e.g., that it was only an error in a pension estimation tool, but it has offered no proof and no relevant documents in support of this being a coding "error." In  response to requests, Kinder Morgan's fiduciaries have refused to produce the application to the IRS or any of the correspondence with the IRS as "not relevant."

161.   This was, at best, a "reinterpretation" of the grandfathered terms of the plan set forth in Appendix X that contravenes those terms, prior representations and

practices, and ERISA's anti-cutback rule. *See, e.g.*, *Cottillion v. United Refining Co.*, 781 F.3d 47, 55 (3d Cir. 2015).

162. *Kushner v. Nationwide Mut. Ins. Co.*, 2019 WL 4696306, 2019 U.S. Dist. LEXIS 164977 (S.D. Ohio 9/26/2019), addressed a mistake "discovered" 10 years later. The district court determined this could not be treated as a mere clerical error when the "source and cause of the error" remained "unknown" and the responsibility for it did not fall squarely on any third-party. *Accord*, *Kenseth v. Dean Health Plan, Inc.*, 610 F.3d 452, 471 (7th Cir. 2010) (fiduciaries cannot claim mere error if they did not take "reasonable steps to head off" inaccurate advice).

163. ERISA also does not allow fiduciaries to make false or  misleading statements with impunity about an "error" that is, in fact, a complete reversal in position and then refuse to produce any information showing any "error." ERISA §409, 29 U.S.C. 1109, provides for "removal" and "other equitable and remedial relief as the court may deem appropriate" for such breaches of fiduciary duty. The prohibition on intentional interference with the attainment of benefit rights in ERISA §510, 29 U.S.C. 1140, also applies to intentionally interfering with the provision of "unreduced" benefits at age 62 if discovery further shows this was a fraud or similarly inequitable conduct.

## Claim VI

### Violations of ERISA's "Actuarial Equivalent" Requirements

164.   Under ERISA §204(c)(3), 29 U.S.C. 1054(c)(3), when a retirement benefit is "determined as an amount other than an annual benefit commencing at normal retirement age," "the employee's accrued benefit ... shall be the actuarial equivalent of such benefit." *See also* the parallel Internal Revenue Code provision at 26 U.S.C. 411(c)(3) and Treas. Reg. 1.411(c)-1(e) (accrued benefit "determined as an amount other than an annual benefit commencing at normal retirement age ... shall be the actuarial equivalent of such benefit, as determined by the Commissioner").

165.   Treas. Reg. 1.411(a)-4(a) likewise provides that adjustments in excess of reasonable actuarial reductions, can result in rights being forfeitable" in violation of ERISA §203(a), 29 U.S.C. 1053(a), and IRC §411(a).

166.   ERISA thus requires that when a plan allows a participant to retire early with a reduced monthly benefit, the value of that reduced benefit must be at least actuarially equivalent to the participant's monthly pension beginning at age 65.

167.   The El Paso Pension Plan still contains a provision for using an outdated "GAM83 mortality table and an 8% interest rate" to determine reductions

to a vested termination benefits for retirements before age 65. That provision appears under Sections 1.3 and 4.5 to Appendix L of the Kinder Morgan Retirement Plan.

168.   Kinder Morgan's October 11, 2020 "detailed" calculation thus stated that because Mr. Pedersen "terminated before obtaining early retirement eligibility," his "vested termination benefit" will be "reduced actuarially using *the GAM 83 mortality table and an 8% interest rate* for commencement prior to Normal Retirement Date."

169.   Continued use of this outdated mortality table and old interest rate (when interest rates are currently below 4%) produces a retirement benefit for Mr. Pedersen at age 62 that is equal to only 71.4% of the benefit at age 65. Use of those assumptions violates ERISA §204(c)(3)'s requirement that early retirement benefits provide at least "actuarially equivalent" benefits to those offered at normal retirement age.

170.   To satisfy "actuarial equivalent" requirement and prevent "adjustments in excess of reasonable actuarial reductions," the interest rates and mortality factors used to compute early retirement reductions must necessarily be updated. This is why the IRC §417(e) interest rates change every year and the mortality tables must be updated at least once every ten years.

171.   ERISA §404(a), 29 U.S.C. 1104(a),  expressly provides that fiduciaries must follow the plan provisions, but only insofar as such provisions are "in accordance with" title I of ERISA. The Supreme Court has established, furthermore, that the duty to manage "embraces" the duty to monitor. *Tibble v. Edison Int'l*, 575 U.S. 523 (2015). Accordingly, fiduciaries have a duty to monitor "actuarially equivalent" factors to ensure that plan provisions or practices that may once have been compliant have not become non-compliant because of declines in interest rates and updated mortality tables.

172.   Kinder Morgan's use of outdated mortality table and interest rate in the October 11, 2019 "detailed" calculation decreases the early retirement benefits offered to less than the actuarial equivalent of the benefit beginning at age 65.

173.   The Claims Administrator's February 27, 2020 letter did not dispute the early retirement reduction factors based on an 8% interest rate and the 83 GAM mortality table must be updated to maintain "actuarial equivalence." Instead, the letter says "[t]here is no current legal requirement under ERISA or the Code that the Plan's early retirement factors be updated."

174.   There is ongoing litigation on this subject, and to date no plan sponsor or fiduciary has prevailed relying on the argument that actuarial assumptions do not have to be updated in order to maintain actuarial equivalence of benefit options,

including early retirement benefits. *Smith v. Rockwell Automation, Inc.*, 2020 U.S. Dist. LEXIS 22406, *8 (E.D. Wis. 2/10/2020), rejected the argument that even if the actuarial assumptions that form the basis for early retirement factors later became unreasonable, the plan sponsor and fiduciaries are not obligated to amend the plan to maintain actuarial equivalence. *See also Smith, et al. v. U.S. Bancorp*., C.A. 18-3405, 2019 WL 2644204, *3 (D. Minn. 6/27/19) (denying motion to dismiss claims that defendant's early commencement factors are not "based on current prevailing interest rates and life expectancies" in conformity with ERISA).

175.   The Claims Administrator's February 27, 2020 letter also says "the IRS has issued multiple favorable determination letters that the terms of the Plan and the El Paso Plan meet applicable qualification requirements."

176.   But there has never been any determination on this issue and IRS Publication 794 states that "[a] determination letter ... does not consider whether actuarial assumptions are reasonable."

177.   The Claims Administrator's February 27, 2020 letter points a finger at Kinder Morgan as if the plan fiduciaries have no responsibility to the participants. The Fiduciary Committee states on page 10 of its August 31, 2020 denial letter that the Fiduciary Committee has no duty to update the interest rate and mortality table used to calculate "actuarial equivalent" early retirement reduction factors.

74

178.    In response to a request for the communications and documents on which that statement was based, the Fiduciary Committee produced nothing.

179.    The plan sponsor and the Fiduciary Committee are both responsible for complying with the law. As the Fiduciary Committee concedes, the plan sponsor has a duty to comply with ERISA, but it is an overlapping not mutually exclusive duty. Under ERISA, fiduciaries must apply plan terms "in accordance with" the provisions of title I of ERISA. The members of the Fiduciary Committee and the Claims Administrator are undeniably fiduciaries under ERISA. If the persons with fiduciary responsibility have no authority, then there would be no point for ERISA §404(a)(1)'s command that fiduciaries shall act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title," which includes the requirement that benefit options by at least the actuarial equivalent of the normal retirement benefit, as well as the protections against "backloading" of benefit accruals and "cutbacks" to early retirement benefits.

180.    Updating with a reasonable interest rate of 4% and the mortality table currently prescribed by IRC §417(e)(3), and ERISA§205(g)(3), an "actuarial equivalent" benefit at age 62 should be at least 81% of the retirement benefit commencing at age 65. Thus, even if Mr. Pedersen was not due an unreduced early

retirement benefit and was due only a vested termination benefit actuarially reduced for "commencement prior to Normal Retirement Date," his benefit at age 62 should be at least $2,980.78 ($3,679.98 * 0.81), instead of the $1,933.69 in Kinder Morgan's October 11, 2019 calculation.

**Prayer for Relief**

WHEREAS, the Plaintiffs pray that this Court:

A.     Declare that in accordance with ERISA's statutory rules and the terms of the Kinder Morgan Retirement Plan and its Appendices, Curtis Pedersen and Beverly Leutloff and all others similarly-situated are entitled to retirement benefits calculated with a "fraction" where the denominator is no more than the maximum of 30 years that can be attained under the Plan.

B.     Declare that ERISA and the terms of the Plan require that the named Plaintiffs and all others similarly-situated have the right to the early retirement benefits provided under the El Paso Plan including that benefits are "unreduced" for commencement after they reach age 62.

C.     Enjoin the Defendants to calculate the amount of participants' retirement benefits and their benefits at age 62 and earlier retirement ages in accordance with those declarations and take all necessary steps to give full effect to that those declarations and injunctions and fully account for the provision of that

relief to Pedersen, Leutloff and all others similarly-situated, including providing past due benefits.

        D.    Order the Defendants to pay interest on past due back payments at no less than the rates of return realized on the Defendant Kinder Morgan, Inc. and the Defendant Kinder Morgan Retirement Plan's equity investments over the same period.

        E.    Order the Defendants to pay attorneys' fees and expenses.

        F.    Award such other equitable and remedial relief as the Court deems appropriate to ensure receipt of all retirement benefits required to give full effect to the Court's declarations and injunction.

                        Respectfully submitted,

                        *s/ Robert B. June*
                        Robert B. June
                        Law Offices of Robert June, PC
                        415 Detroit St., 2nd Floor
                        Ann Arbor, MI 48104-1117
                        Phone: (734) 481-1000
                        Primary E-Mail:
                        bobjune@junelaw.com
                        Attorney Bar #: P51149

                        *s/ Stephen R. Bruce*
                        Stephen R. Bruce
                        Stephen R. Bruce Law Offices
                        1667 K St., NW, Suite 410
                        Washington, DC 20006

Phone: (202) 289-1117
Primary E-Mail:
stephen.bruce@prodigy.net

*s/ Tybe Ann Brett*
Tybe Ann Brett
*s/ Joel R. Hurt*
Joel R. Hurt
Feinstein Payne Doyle & Kravec, LLC
429 Fourth Ave., Suite 1300
Pittsburgh, PA 15219
Phone: (412) 281-8400
Primary E-Mail: tbrett@fdpklaw.com
Primary E-Mail: jhurt@fdpklaw.com

Attorneys for Plaintiffs

Dated:  May 18,  2021

**Plaintiffs' Addresses:**

Curtis T. Pedersen
8000 Driftwood Dr.
Fenton, MI 48430

Beverly Leutloff
998 N. Westshore Blvd.
Manteno, IL 60950

**Service Address for All Defendants:**

Assistant General Counsel
Kinder Morgan, Inc.
1001 Louisiana Street, Suite 1000
Houston, TX 77002