United States District Court
Southern District of Texas
**ENTERED**
July 25, 2024
Nathan Ochsner, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **CURTIS T PEDERSEN**, *et al.*, | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| VS. | § | **CIVIL ACTION NO. 4:21-CV-03590** |
| | § | |
| **KINDER MORGAN INC**, *et al.*, | § | |
| | § | |
| **Defendants.** | § | |

## <u>MEMORANDUM & ORDER</u>

Before the Court are four motions: (1) Plaintiffs' Motion for Partial Summary Judgment (ECF No. 206); (2) Defendants' Motion for Summary Judgment (ECF No. 208); (3) Defendants' Motion to Exclude the Testimony of Michael L. Libman (ECF No. 210); and (4) Defendants' Motion for Leave to File a Sur-Reply in Opposition to Plaintiffs' Motion for Summary Judgment (ECF No. 219). For the reasons that follow, the Court **GRANTS IN PART AND DENIES IN PART** the parties' respective Motions for Summary Judgment, **DENIES** Defendants' Motion to Exclude, and **DENIES** Defendants' Motion for Leave.

### I.     BACKGROUND

Plaintiffs bring this suit under the Employee Retirement Income Security Act (ERISA). ERISA's central object is to "protect[] employees' justified expectations of receiving the benefits their employers promise them." *Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 743 (2004). ERISA does not require employers to establish retirement plans and does not prescribe any particular level of benefits an employer must provide should they choose to establish a

1

retirement plan. *See Kifafi v. Hilton Hotels Ret. Plan*, 616 F. Supp. 2d 7, 10 (D.D.C. 2009), *aff'd*, 701 F.3d 718 (D.C. Cir. 2012) (citing *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996)); *see also Kifafi v. Hilton Hotels Ret. Plan*, 701 F.3d 718, 722 (D.C. Cir. 2012) ("ERISA guarantees neither a particular benefit nor a particular method for calculating the benefit"). "ERISA does, however, seek to ensure that employees will not be left emptyhanded once employers have guaranteed them certain benefits." *Heinz*, 541 U.S. at 743. That is to say, ERISA ensures that "if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it." *Id.* (quoting *Lockheed Corp.*, 517 U.S. at 887); *see also* J. LANGBEIN & B. WOLK, PENSION AND EMPLOYEE BENEFIT LAW 121 (3d ed. 2000) ("The central problem to which ERISA is addressed is the loss of pension benefits previously promised").

This case has had a multi-year history before this Court. The Court detailed the factual background of the case in its August 2022 and February 2024 opinions, *Pedersen v. Kinder Morgan Inc.*, 622 F.Supp.3d 520, 526–29 (S.D. Tex. 2022) and *Pedersen v. Kinder Morgan Inc.*, 345 F.R.D. 302, 308–09 (S.D. Tex. 2024). It repeats the facts here to the extent they are relevant to the Motions for Summary Judgment. Unless otherwise indicated, the underlying facts are not disputed.

### A.  Kinder Morgan Plan Background

Class members in this case are participants in Kinder Morgan Retirement Plan A or Plan B (collectively, "Plan").[1] The history of the Plan is somewhat complex, as various iterations wound their way through several corporate transactions over many decades. Those transactions proceeded as follows: (1) Coastal Corporation acquired the ANR Company in 1985; (2) El Paso

---

[1] In its August 18, 2022 opinion, this Court explained that participants of both plans "are subject to the same general practices and suffer from the same alleged injuries." *Pedersen*, 622 F.Supp.3d at 542 (Ellison, J.).

acquired the Coastal Corporation in 2001; (3) El Paso sold ANR to TransCanada Corporation in

2007; and (4) Kinder Morgan acquired El Paso in 2012. *Pedersen*, 345 F.R.D. at 308. As it

changed hands, the Plan was subject to several significant amendments. Presently, the parties'

dispute concerns four separate features of the Plan.

### 1. Coastal Transition Benefit Formula

The first Plan provision of note concerns the formula it uses to calculate benefit accrual.

A previous iteration of the benefit formula appeared in the Coastal Corporation's pension plan,

and provided that:

> A Participant who is 100% vested and who retires on his Normal Retirement Date shall
> be entitled to the Actuarial Equivalent of a Retirement Income for the life of the
> Participant with payments commencing on his Normal Retirement Date, in an annual
> amount equal to the greater amount computed under Formula One or Formula Two.

Defs.' Ex 2, Coastal Corporation Pension Plan, § 5.1(a), 21, ECF No. 208-3 ("Coastal Plan").

Formula One calculated benefits as:

> the product of the vested percentage as determined under provisions of the Plan of the
> Participant multiplied by the remainder of (A) minus (B), where (A) equals two percent
> of the Final Average Earnings of the Participant multiplied by the number of Years of
> Service of the Participant to a maximum of thirty years and (B) equals [a social security
> offset].

*Id.* Formula Two was the "product of the Vested Percentage of the Participant multiplied by the

product of forty-eight dollars multiplied by the number of Years of Service of the Participant."

*Id.* The Coastal Plan further provided that, if a plan participant retired before normal retirement

age (i.e., age 65), it would calculate retirement benefits:

> by substituting Years of Service up to the maximum number of Years of Service
> specified in the applicable benefit formula which the Participant would have attained had
> he continued to earn uninterrupted Years of Service until his Normal Retirement Age in
> lieu of his actual Years of Service and then multiplying such Retirement Income amount
> by a fraction . . . the numerator of the fraction is the actual Years of Service of the
> Participant at the date of termination of employment and the denominator of the fraction

is the Years of Service which the Participant would have attained had he continued to earn uninterrupted Years of Service until his Normal Retirement Age.

*Id.* at § 5.1(c), 22. When El Paso acquired the Coastal Corporation in 2001, it added a "Coastal Appendix" to its Plan, which allowed previous ANR employees to maintain benefits they accrued from the start of their employment with ANR and incorporated the Coastal Plan's benefit formula, with a few notable changes. Pls.' Ex. 1, El Paso Plan § 4.1(c)(i), 123, ECF No. 206-2 ("El Paso Plan"); *see also* Pls.' Ex. 4, 3, ECF No. 206-5. The Coastal Appendix now appears in Defendant Kinder Morgan's Plan. It provides that each Coastal participant's benefits stopped accruing on March 31, 2006. El Paso Plan at § 4.1(c)(i), 123. It further provides that Coastal participants' benefits accrue according to the following calculations:

The net of (I) minus (II) is multiplied by (III) where:

(I)     is two percent (2%) of the Participant's Final Average Monthly Earnings times his or her projected Credited Service determined as if the Participant continued to be an Active Participant until his or her Normal Retirement Date (up to a maximum of 30 years and determined without regard to the March 31, 2006 cut-off for Credited Service referenced above), and

(II)     is one and one-half percent (1.5%) of the Participant's Primary Social Security Amount times his or her projected Credited Service determined as if the Participant continued to be an Active Participant until his or her Normal Retirement Date (up to a maximum of 33.333 years and determined without regard to the March 31, 2006 cut-off for Credited Service referenced above); and

(III)     is the Participant's Credited Service at termination of employment divided by the Participant's projected Credited Service determined as if the Participant continued to be an Active Participant until his or her Normal Retirement Date (determined without regard to the March 31, 2006 cut-off date for Credited Service referenced above).

*Id.*

### 2. Ninth Amendment

The second central plan provision at issue is a 2007 Amendment to the Plan, which took effect after El Paso sold ANR to TransCanada. The 2007 Amendment provided that:

> Notwithstanding any other Plan term to the contrary, a Participant who . . . is an Employee of ANR Pipeline Company or any other Affiliated Company, on the date upon which ANR Pipeline Company ceases to be an Affiliated Company (the "Closing Date") . . . shall be deemed to have terminated employment after attaining age 55 for purposes of determining whether the Participant is entitled to an Early Retirement Benefit in lieu of a Vested Termination Benefit, but not for determining the Participant's earliest Early Retirement Date . . . provided the Participant is at least 53 and has not yet attained age 55 on the Closing date.

Pls.' Ex. 25, Ninth Amendment to the El Paso Corporation Pension Plan, 2, ECF No. 206-26 ("Ninth Amendment"). In other words, the Ninth Amendment ended El Paso's previous policy of granting early retirement eligibility to previous ANR employees who turned 55 and completed five years of service—because continued service with TransCanada no longer qualified as service under the plan—with the exception of allowing participants who were 53 or older and had completed five years of service to keep early retirement benefits. *See id.* Participants received a Notice in February 2007 explaining these changes. *See* Pls.' Ex. 26, El Paso February 2007 Notice, 2, ECF No. 206-27 ("2007 Notice").

### 3. ANR Legacy

The Plan also includes an ANR Legacy[2] section, which states that:

> the Coastal Transition Benefit for a Participant who was an 'employee' of a participating employer in the [ANR Plan] prior to December 1, 1986, shall be the amount determined, under Section 4.1(c)(i) plus the amount equal to 0.3% of Final Average Monthly Earnings multiplied by years of credited service under the ANR Plan prior to 1986. This additional ANR [legacy] benefit is subject to . . . the Vested Termination Benefit reduction in Section 4.5(c) . . . in the event benefits commence prior to age 62.

El Paso Plan § 4.1(c)(iv), 124–25. That is, ANR employees hired before December 1, 1986 accrue benefits according to the Coastal Transition Benefit formula and the second formula set forth in the legacy section. The parties dispute whether this section means that the entire benefit,

---

[2] This provision, as it appears in the Plan, is titled "ANR Grandfather." The Court's February 2024 opinion explains its decision to instead refer to this provision as "ANR Legacy." *See Pedersen*, 345 F.R.D. at 309 n.2.

or only the smaller, second part of the benefit, is unreduced if an eligible ANR participant

commences benefits at age 62.

### 4. Actuarial Reduction

For all Plan participants who were ineligible for an unreduced benefit at age 62, the Plan

provided that, if they commenced benefits before age 65, their benefits would be actuarially

reduced based on the "1983 Group Annuity Mortality Table" ("GAM83 mortality table") and an

8% interest rate. Defs.' Ex. 11, Kinder Morgan Retirement Plan A Appendix L, 402, 439–42,

ECF No. 208-12. The Plan's use of the GAM83 mortality table and 8% interest rate is the final

provision that forms the basis of Plaintiffs' claims.

### B. Factual and Procedural Background

Plaintiffs Curtis Pedersen and Beverley Leutloff began working for ANR prior to 1986,

when they were ages 21 and 19, respectively. Pls.' Am. Compl. ¶¶ 1–2, ECF No. 18. Pedersen

and Leutloff continued to work for ANR through its sale to TransCanada in 2007. *See* Defs.' Ex.

24, Pedersen Tr., 12:22–13:5, ECF No. 208-25; Defs.' Ex. 23, Leutloff Tr., 29:22–30:14, ECF

No. 208-24. At the time of the 2007 sale, Pedersen was 49 and Leutloff was 48. *See* Pls.' Am.

Compl. at ¶¶ 1–2.

Following the 2007 sale and Ninth Amendment to the Plan, Pedersen, Leutloff, and

similarly situated individuals received estimates indicating that they would be able to receive

unreduced benefits at age 62, even though they had not accumulated five years of service and

reached age 53 by 2007. *See* Defs.' Ex. 22, Noonan Tr. 86:5–19, ECF No. 208-27; *see* Pls.' Am.

Compl. at ¶¶ 1–2. In successive years, others who had not satisfied the Ninth Amendment's

stated early eligibility criteria actually began receiving unreduced benefits once they turned 62.

Defs.' Ex. 22, Noonan Tr. 86:20–87:1. Defendants maintain that this was the result of an error on

the part of their third-party administrator, Telus, which "calculated the benefits incorrectly, which was not in conformance with the plan document." *Id.* at 88:20–24; *see also* Defs.' Ex. 16, Kinder Morgan Voluntary Compliance Program Application, 18, ECF No. 208-17 ("VCP Application"). Upon discovery of the purported error, Kinder Morgan submitted a Voluntary Compliance Program ("VCP") application to the IRS that would amend the plan to (1) allow any participant who had retired and was in pay status to continue to receive benefits in the unreduced amount, but (2) otherwise correct the error to provide the correct amount of benefits to any participant not in pay status. *See* VCP Application at 19–20.

After Kinder Morgan made this correction, Pedersen noticed that his online benefits estimate was lower than it previously had been. On June 28, 2019, Pedersen sent a letter to the Kinder Morgan Benefits Services Center alleging that the Ninth Amendment violated ERISA by failing to allow former ANR participants to "grow into" early retirement eligibility, as previous iterations of the plan had allowed them to do. *See* Defs.' Ex. 15, 2–3, ECF No. 208-16.

In response, Kinder Morgan clarified that the effect of the Ninth Amendment was that, when El Paso sold ANR to TransCanada, Mr. Pedersen "became an employee of TransCanada or one of its subsidiaries and began accruing benefits under the TransCanada plans." Defs.' Ex. 17, 3, ECF No. 208-18. Thus, his employment with El Paso ended in 2007, and he could no longer "grow into" early retirement eligibility pursuant to El Paso's plan. *See id.* Kinder Morgan also explained that the Ninth Amendment was in compliance with ERISA § 204(g)(2)—which prohibits plan amendments that eliminate or reduce already-accrued benefits—as it expanded, rather than eliminated, the class of individuals entitled to early retirement benefits. *Id.* at 4. That is, it permitted participants who were at least age 53 (rather than the previous 55) and completed five years of service at the time of termination of employment to receive an early retirement

benefit. *Id.* Lastly, Kinder Morgan explained that "[p]rior to March 31, 2018, an error existed in the Plan recordkeeper's system which caused [Pedersen] to be incorrectly categorized as having satisfied the Early Retirement Criteria prior to terminating employment," and, therefore, online estimates showed that Pedersen was entitled to an unreduced benefit at age 62 instead of a benefit with an actuarial reduction. *Id.*

After receiving that letter, Pedersen filed his claim for benefits under the claim procedures, presenting four claims to the Claims Administrator. His claims were as follows: (1) The reduction of Mr. Pedersen's "Part 1" normal retirement benefit of $4,127.08 via application of a fraction that uses 43.4167 years in the denominator (i.e., that does not use a 30-year maximum as the denominator) violates ERISA's benefit accrual rules, the Plan's terms, and ERISA's anti-cutback rule; (2) ERISA's anti-cutback rule requires that the Plan allow Mr. Pedersen and other ANR employees to "grow into" early retirement eligibility based on continuing service with ANR; (3) Even if Mr. Pedersen was held to only be eligible for a vested termination benefit, Sections 4.1(c)(iv) and 4.3(c) of the Plan provide that at age 62, he is eligible for an unreduced 100% benefit, which also may not be taken away by "reinterpretation"; and (4) The Plan provisions for using an old and outdated "GAM83 mortality table and an 8% interest rate" for a vested termination benefit violate ERISA's "actuarial equivalence" requirement. Defs.' Ex. 18, 3–7, ECF No. 208-21.

The Claims Administrator denied claims 1, 2, and 4, and partially granted claim 3. Pls.' Ex. 4 at 5–10. As to claim 1, the Administrator interpreted the Plan language to mean that there is no limit on credited service projected to the normal retirement date (i.e., the "denominator" in Section 4.1(c)(i)(A)(III) of the Coastal Appendix is not subject to a 30-year maximum) and that the Plan complies with ERISA's "fractional rule" set forth in § 204(b)(1)(C). *Id.* at 5–7. For

8

claim 2, the Administrator determined that the Ninth Amendment did not violate ERISA §

204(g)(2)'s anti-cutback rule and confirmed that, following the Ninth Amendment, Mr. Pedersen

was not eligible to continue accruing service or benefits under the Plan. *Id.* at 7–9. Regarding

claim 4, the Administrator explained that the Plan's reduction factors did not violate ERISA §

204(c)(3), as there was no legal requirement that the Plan's early reduction factors be updated.

*Id.* at 9. Lastly, the Administrator partially granted claim 3, reasoning that, pursuant to Section

4.1(c)(iv) of Appendix L of the Plan, Sub-Appendix X, a portion of the ANR legacy benefit is

only subject to an early retirement reduction if the participant commences benefits before age 62.

*Id.* at 9–10. Because Pedersen commenced his benefits "at or after age 62," the Administrator

determined that "the ANR [legacy] benefit portion of his accrued benefit under the Plan is not

subject to reduction for early retirement." *Id.* at 10.

Pedersen appealed the Plan's Claim Administrator's decision, and the Fiduciary

Committee denied the appeal for the same reasons that the Administrator denied the claims. *See*

Pls.' Ex. 3, ECF No. 206-4. Pedersen then filed the instant class action suit.

Plaintiffs bring six ERISA claims in connection with the above-listed Plan provisions.

Claims I, II, and III take issue with the Coastal Transition Benefit formula, as amended in 2001.

Claim I argues that Defendants improperly interpreted the Coastal Transition Benefit formula in

a manner that violates ERISA's anti-backloading provisions. Claim II argues that the formula's

2001 amendments violate ERISA's anti-cutback provisions. Claim III asserts that Defendants did

not provide participants with proper notice of the changes as required by ERISA's disclosure

requirements.  Claims IV and V submit that Defendants impermissibly deprived participants of

access to early retirement benefits to which they are entitled. Claim IV argues that the Ninth

Amendment eliminated participants' early retirement benefits in violation of ERISA's anti-

cutback provisions. Claim V submits that Defendants improperly interpreted the ANR Legacy provision of the Plan. Plaintiffs ask the Court to interpret and enforce the ANR Legacy provision such that it would provide them with an independent entitlement to unreduced early retirement benefits. Lastly, Claim VI contends that, even if participants are not due an unreduced early retirement benefit under Claim IV and/or Claim V, the actuarial assumptions used to calculate the benefit reductions are unreasonably outdated.

In 2022, this Court granted Defendants' Motion for Judgment on the Pleadings in part. *See Pedersen*, 622 F.Supp.3d at 532–35. The 2022 ruling allowed Claims I and V to proceed under ERISA § 502(a)(1)(B) and allowed the remaining four claims (II, III, IV, and VI) to proceed under ERISA § 502(a)(3). *See id.* Later, in 2024, the Court granted Plaintiff's Motion for Class Certification, certifying a general class comprised of three subclasses which, in turn, correspond with the three classes of claims above—i.e., benefit accrual (I–III), early retirement (IV–V), and actuarial equivalence (VI). *Pedersen*, 345 F.R.D. at 322. Most recently, Plaintiffs and Defendants have each moved for Summary Judgment as to all six claims. Plaintiffs' Motion also raises evidentiary objections to the report of Defendants' expert, Lawrence Sher. Defendants also filed a Motion to Exclude the Testimony of Michael L. Libman and a Motion for Leave to File a Sur-Reply in Opposition to Plaintiffs' Motion for Summary Judgment.

## II.    LEGAL STANDARD

### A.  Summary Judgment

Summary judgment under Rule 56 "is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting FED. R. CIV. P. 56(c)). A genuine issue as to a material fact arises "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must draw all "reasonable inferences . . . in favor of the nonmoving party, but the nonmoving party 'cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.'" *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007) (quoting *Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 343 (5th Cir. 2007)).

"[T]he movant bears the initial responsibility of demonstrating the absence of a genuine issue of material fact with respect to those issues on which the movant bears the burden of proof at trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718 (5th Cir. 1995). "For any matter on which the non-movant would bear the burden of proof at trial, however, the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Id.* at 718–19.

### B. Non-Statutory Claims

Claims I and V involve issues of plan interpretation. Accordingly, the Court reviews these claims for abuse of discretion and applies the Fifth Circuit's two-prong analysis. *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 638 (5th Cir. 1992). First, the Court determines whether the plan administrator's interpretation of the plan was "legally correct," considering the following factors: "(1) whether the administrator has given the plan a uniform construction, (2) whether the interpretation is consistent with a fair reading of the plan, and (3) any unanticipated costs resulting from different interpretations of the plan." *Id.* Second, if the Court concludes that the

administrator's interpretation was legally incorrect, it asks whether the administrator abused its discretion. *Id.* At this second step, the Court considers "(1) the internal consistency of the plan under the administrator's interpretation, (2) any relevant regulations formulated by the appropriate administrative agencies, and (3) the factual background of the determination and any inferences of lack of good faith." *Id.*

In conducting this abuse-of-discretion analysis, a reviewing court generally confines its review to the administrative record, even in the face of disputed underlying facts. *Ariana M. v. Humana Health Plan of Texas, Inc.*, 884 F.3d 246, 256 (5th Cir. 2018). However, a district court may consider evidence outside of the administrative record "to explain how the administrator has interpreted the plan's terms in previous instances." *Id.* (citing *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 299 (5th Cir. 1999)).[3] That said, district courts may not "receiv[e] evidence to resolve disputed material facts—i.e., a fact the administrator relied on to resolve the merits of the claim itself." *Vega*, 188 F.3d at 299.

### C. Statutory Claims

The parties agree that Claims II, III, IV, and VI present questions of statutory interpretation and are therefore reviewed *de novo*. *See Spacek v. Mar. Ass'n*, 134 F.3d 283, 288 (5th Cir. 1998), *abrogated on other grounds by Heinz*, 541 U.S. 739 (2004); *Penn v. Howe-Baker Engineers, Inc.*, 898 F.2d 1096, 1100 (5th Cir. 1990) ("[I]n contrast to the great deference we grant the Committee's interpretations of the Plan . . . we accord no deference to the Committee's conclusions as to the controlling law, which involve statutory interpretation.").

---

[3] A district court also may admit evidence to assist in its understanding of medical terminology related to a benefits claim. *Id.* That exception does not apply in this case.

### III.    OBJECTIONS TO EXPERT TESTIMONY

#### A.  Defendants' Motion to Exclude the Testimony of Michael L. Libman

Defendants seek to exclude the testimony of Plaintiffs' expert Michael L. Libman as unreliable under Federal Rule of Evidence 702. ECF No. 210. Plaintiffs offer Mr. Libman as an expert on benefits under ERISA's accrual rules and "actuarial equivalent" reductions. *See* Pls.' Ex. 7, Expert Report of Michael Libman, 1, ECF No. 206-7 ("Libman Rpt."). Mr. Libman has been a pension actuary for over forty years. *See id.* In that time, he has testified as an expert on pension issues in many cases. *Id.*

 In this case, Mr. Libman's expert reports support Claims I and VI by opining (1) that the Coastal Transition Benefit formula is impermissibly backloaded in violation of 29 U.S.C. § 1054(g), and (2) that the Plan's actuarial factors used to reduce benefits for commencement before retirement date are unreasonable in violation of 29 U.S.C. § 1054(c)(3). *See generally* Libman Rpt.; Rebuttal Expert Report of Michael Libman, ECF No. 210-2 (rebuttal to Defendants' Expert Lawrence Sher) ("Libman Rebuttal Rpt."). Mr. Libman's testimony is based upon a close read of statutory rules, Treasury Regulations, applicable legal precedent and authority, the Plan document, and relevant documentation provided by Defendants. *See* Libman Rpt. at ¶ 1. Based on his read of the Plan provisions, Mr. Libman's report sets forth actuarial calculations to assess whether the Plan complies with ERISA's anti-backloading and actuarial equivalence provisions.

Under Federal Rule of Evidence 702, "the district judge [has] a gatekeeping role to ensure that scientific testimony is both reliable and relevant." *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012). Here, the parties agree that Mr. Libman's testimony is relevant. Further, Defendants do not contest that Mr. Libman is well-qualified to provide expert opinion

on pension issues. *See* ECF No 206-7 at 2 (describing Mr. Libman's credentials). Nevertheless,

they dispute whether Mr. Libman's testimony is reliable. Plaintiffs, the party seeking to admit

Mr. Libman's testimony, bear the burden of "demonstrat[ing] that the expert's findings and

conclusions are based on the scientific method, and, therefore, are reliable." *Johnson*, 685 F.3d at

459 (quoting *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir.1998) (en banc)). For

Mr. Libman's testimony to be admitted, Plaintiffs need only show that his opinion is reliable by a

preponderance of the evidence.[4] *Gibson Brands, Inc. v. Armadillio Distribution Enterprises, Inc.*,

534 F. Supp. 3d 694, 697 (E.D. Tex. 2021) (citing *Moore*, 151 F.3d at 276).

     After reviewing the parties' filings and Mr. Libman's testimony, the Court finds that

Plaintiffs have shown, by a preponderance of the evidence, that Mr. Libman's testimony is

reliable. In so finding, the Court notes that the *Daubert* inquiry does not require district courts to

assess whether an expert's testimony is *correct*; courts need only determine whether the

testimony is *reliable*. *Prantil v. Arkema France S.A.*, No. 4:17-CV-02960, 2022 WL 1570022, at

*3 (S.D. Tex. May 18, 2022) (Ellison, J.); *Moore*, 151 F.3d at 276; *In re Paoli R.R. Yard PCB

Litig.*, 35 F.3d 717, 744 (3d Cir. 1994). While some of Mr. Libman's interpretations of the Plan

are perhaps open to question, there is no issue with the reliability of his testimony in general.

Moreover, "[m]ost of the safeguards provided for in *Daubert* are not as essential in a case such

as this where a district judge sits as the trier of fact in place of a jury." *Roton v. Peveto Fin. Grp.*,

---

[4] Courts consider the following non-exhaustive factors when assessing reliability:
    (1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected
    to peer review and publication; (3) the known or potential rate of error of the method used and the existence
    and maintenance of standards controlling the technique's operation; and (4) whether the theory or method
    has been generally accepted by the scientific community.
*Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 668–69 (5th Cir. 1999) (citing *Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579, 593–94 (1993)).

*LLC*, 649 F. Supp. 3d 300, 310 (N.D. Tex. 2022) (quoting *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000)).

Accordingly, The Court **DENIES** Defendants' Motion to Exclude. The potential flaws Defendants identify in Mr. Libman's report go to weight, not admissibility.

### B.  Plaintiffs' Objections to the testimony of Lawrence Sher

As with Defendants' evidentiary objections, Plaintiffs do not dispute that Mr. Sher's is qualified to serve as an actuarial expert. Pls.' Resp. to Defs.' Mot, 12, ECF No. 213. Indeed, Mr. Sher has practiced as an actuary for over 50 years, specializes in retirement benefits, and has testified as an expert in several cases. Defs.' Ex. 26, Sher Expert Rep., ¶¶ 4–6, ECF No. 208-31. Instead of disputing Mr. Sher's credentials, Plaintiffs argue that certain facets of his report are unreliable under Federal Rule of Evidence 702 and related case law.

Mr. Sher's report acknowledges that "Plan interpretation is ultimately a legal function not an actuarial one, although [he has] often been asked by attorneys for [his] views on plan interpretation, especially where there are actuarial concepts or other technical issues involved." *Id.* at ¶ 113. Mr. Sher proceeds to state:

> [W]hile I am not an attorney and any advice that I provide to clients or opinions I render in legal proceedings, such as this one, are not legal advice or opinions, my knowledge and experience as an actuary provide a basis for me to form an opinion about whether a pension plan conforms to applicable laws and regulations.

*Id.* at ¶ 14. Plaintiffs argue that Mr. Sher's "opinions" and "thoughts" about the Plan's conformity with applicable laws and regulations are not the product of reliable principles and methods that have been reliably applied to the facts of this case. Pls.' Resp. to Defs.' Mot at 12. The Court is not persuaded by Plaintiffs' arguments. Mr. Sher expressly states that his opinions are not legal advice or opinions. Further, the opinions Plaintiffs take issue with are based upon Mr. Sher's many years of actuarial experience. *See id.* The Fifth Circuit has made clear that "an

expert witness is not strictly confined to his area of practice, but may testify concerning related applications" and that "[a] lack of specialization should generally go to the weight of the evidence rather than its admissibility. *Cedar Lodge Plantation, L.L.C. v. CSHV Fairway View I, L.L.C.*, 753 F. App'x 191, 195 (5th Cir. 2018) (quoting *United States v. Wen Chyu Liu*, 716 F.3d 159, 168 (5th Cir. 2013)). The Court **OVERRULES** Plaintiffs' objections.

## IV.     MOTIONS FOR SUMMARY JUDGMENT

### A.  Claim I

Plaintiffs' first claim asks the Court to "interpret" the Kinder Morgan Plan's provisions so that the denominator in the fraction calculating participants' benefits is limited to a 30-year maximum. *Pedersen*, 622 F. Supp. 3d at 534. Plaintiffs favor this interpretation because if the "projected Credited Service" figure in the denominator is allowed to exceed 30, the effect is to reduce benefits for individuals who were hired before age 35 (given that the "Normal Retirement Date" is at age 65). *See* Pedersen, 622 F. Supp. 3d at 529 (explaining how elimination of the 30-year maximum decreased Mr. Pedersen's monthly benefits); *see also Pedersen*, 345 F.R.D. at 313, 322 (conceiving of the Benefit Accrual Subclass as employees who were hired before age 35, such that their normal retirement benefit is greater than the accrued benefits that El Paso or Kinder Morgan offered them). Plaintiffs contend that any other reading of the Plan would violate ERISA's anti-backloading rule. By contrast, the Administrator concluded that there was no limit on credited service projected to the normal retirement and that the Plan complied with ERISA's fractional rule. Pls.' Ex. 4 at 5–7. The Court shall proceed to summarize ERISA's anti-backloading rule, and then review each of these conclusions under the Fifth Circuit's two-step abuse of discretion framework. *See Wildbur*, 974 F.2d at 637.

### 1. Statutory Background

§ 204 of ERISA prevents employers from "backloading" benefits, that is, "providing inordinately low rates of accrual in the employee's early years of service when he is most likely to leave the firm and by concentrating the accrual of benefits in the employee's later years of service when he is most likely to remain with the firm until retirement." *Langman v. Laub*, 328 F.3d 68, 71 (2d Cir.2003) (quoting H.R. Rep. No. 93–807 (1974), reprinted in 1974 U.S.C.C.A.N. 4639, 4688). In service of this aim, § 204 requires a defined benefit pension plan (like the one at issue here) to accrue benefits according to any one of three alternative formulas: the 3% rule, the 133-1/3% rule, or the fractional rule. ERISA § 204, 29 U.S.C. § 1054; 26 C.F.R. § 1.411(b)-1(a)(1). The 3% rule is not relevant to the present dispute, as the parties agree that Kinder Morgan's Plan does not comply with that rule.

The 133-1/3% rule "permits the use of any accrual formula as long as the accrual rate for a given year of service does not vary beyond a specified percentage from the accrual rate of any other year under the plan." *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 514 n.9 (1981). The fractional rule is "essentially a pro rata rule under which in any given year, the employee's accrued benefit is proportionate to the number of years of service as compared with the number of total years of service appropriate to the normal retirement age." *Id.*

### 2. Abuse-of-discretion review

As noted above, the Administrator interpreted the Plan such that (1) there was no 30-year limit on credited service projected to the normal retirement and (2) the Plan complied with ERISA's fractional rule. Pls.' Ex. 4 at 5–7. The first question is whether this interpretation is "legally correct." *N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, 781 F.3d 182, 195 (5th Cir. 2015). The "'most important factor to consider' in the legal correctness inquiry is

whether [the Administrator's] 'interpretation is consistent with a fair reading of the plan.'" *Id.* (quoting *Crowell v. Shell Oil Co.*, 541 F.3d 295, 313 (5th Cir. 2008)).

Plaintiffs point out that El Paso's Plan "uses the term 'projected Credited Service' twice. The first time the term is used with an express limitation, namely, 'projected Credited Service … with a maximum of 30 years.' . . . The second time the term 'projected Credited Service' is used in the formula the maximum is not repeated." Pls.' Mot. 19, ECF No. 206 (citing El Paso Plan at § 4.1(c)(i)(A), 123). Pursuant to the "presumption of consistent usage," *id.* (citing ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 170–71 (1st ed. 2012)), Plaintiffs submit that "the second reference is presumed to have the same maximum." The Court disagrees. The plain text of the El Paso Plan undermines Plaintiffs' argument. As in section I and II, section III notes that the "projected Credited Service" is "determined without regard to the March 31, 2006 cut-off date for Credited Service referenced above." El Paso Plan at § 4.1(c)(i)(A), 123. It could have also repeated section I's 30-year limitation, but it did not. Moreover, section II refers to "projected Credited Service" subject to a 33.333-year maximum. *Id.* The El Paso Plan language is clear: the projected Credited Service in (I) is subject to a 30-year maximum, the projected Credited Service in (II) is subject to a 33.333-year maximum, and the projected Credited Service in (III) is subject to no maximum. Therefore, the Court concludes that the Administrator's determination that the denominator in the benefits calculation is not subject to a 30-year maximum was correct.

Before the Court addresses whether the Administrator's conclusion that the Plan satisfies the fractional rule is correct, it must determine the impact that *Tomlinson v. El Paso Corp.*, 653 F.3d 1281 (10th Cir. 2011) has on this case. Like this case, *Tomlinson* involved an ERISA-based challenge to El Paso's pension plan. *See id.* at 1283. Defendants use *Tomlinson* to argue that

collateral estoppel prevents Plaintiffs from "relitigating whether the Coastal Benefit Transition formula is backloaded." Defs.' Mot. 23, ECF No. 208. Plaintiffs contend that *Tomlinson* judicially estops Defendants from arguing that their Plan complies with the fractional rule, because "Defendants secured favorable rulings from the *Tomlinson* courts and the IRS based on their representations that the Plan's formulas complied with the 133-1/3% rule." Pls.' Mot. at 24.

The *Tomlinson* plaintiffs' claims concerned "'wear-away periods' that occurred during El Paso's transition to a new pension plan." 653 F.3d at 1283; *see also* Defs.' Mot. at 24 n.7 (acknowledging the same). The *Tomlinson* plaintiffs alleged that the wear-away periods violated ERISA's anti-backloading provisions. *Id.* at 1285.[5] The parties agreed that, in order for El Paso's plan to comply with ERISA's anti-backloading provisions, it "must qualify under the '133 1/3 percent' test if it qualifies at all." *Tomlinson*, 653 F.3d at 1290; *see also Tomlinson*, 2008 U.S. Dist. LEXIS 21668, at *7–*8 ("The parties agree that the only provision at issue here is the 133 1/3% rule under 29 U.S.C. § 1054(b)(1) (two other formulas are included in the statute but do not apply here)."). The *Tomlinson* court ultimately concluded that the benefit accruals in the wear-away periods were "frontloaded, not backloaded." *Tomlinson*, 653 F.3d at 1291.

Based on the forgoing, the Court rejects Defendants' argument that collateral estoppel prevents Plaintiffs from bringing anti-backloading claims here. Collateral estoppel precludes a party from litigating an issue already raised in an earlier action between the same parties[6] where: (1) the issue at stake is identical to the one involved in the earlier action; (2) the issue was

---

[5] Additionally, the *Tomlinson* plaintiffs brought claims alleging violations of the Age Discrimination in Employment Act and alleging that defendants provided inadequate notice and summary plan descriptions. *Tomlinson v. El Paso Corp.*, Civil Action No. 04-cv-02686, 2008 U.S. Dist. LEXIS 21668, at *5 (D. Colo. 2008); *Tomlinson*, 653 F.3d at 1285. Those claims are not relevant to the collateral and judicial estoppel issues now before this Court.

[6] Defendants assert that the parties in this case are the "same parties" as in *Tomlinson* because, "by virtue of successive corporate acquisitions and plan mergers," the plaintiffs in both cases are "participants in either the El Paso or Kinder Morgan Plan who were entitled to the Coastal Transition Benefit." Defs.' Mot. at 24. Plaintiffs disagree, and argue that collateral estoppel is therefore inapplicable. Because it finds that collateral estoppel does not apply based on separate grounds, the Court does not address this argument.

actually litigated in the prior action; and (3) the determination of the issue in the prior action was a necessary part of the judgment in that action. *Petro-Hunt, L.L.C. v. United States*, 365 F.3d 385, 397 (5th Cir. 2004). Collateral estoppel is inapplicable here, because the issues raised in each case are not identical. That is, the issue in *Tomlinson* was the legality of the wear-away periods, not the legality of the Coastal Transition Benefit formula.

Separately, the doctrine of judicial estoppel "prevent[s] internal inconsistency, preclud[es] litigants from playing fast and loose with the courts, and prohibit[s] parties from deliberately changing positions according to the exigencies of the moment." *In re Coastal Plains, Inc.*, 179 F.3d 197, 206 (5th Cir. 1999) (quoting *United States v. McCaskey*, 9 F.3d 368, 378 (5th Cir.1993)). Judicial estoppel prevents a party from asserting a particular legal position where (1) the position is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently. *Allen v. C & H Distributors, L.L.C.*, 813 F.3d 566, 572 (5th Cir. 2015). Plaintiffs point out that Defendants conceded in *Tomlinson* "that its plan must qualify under the '133 1/3 percent' test if it qualifies at all." 653 F.3d at 1290; *see also Tomlinson*, 2008 U.S. Dist. Lexis 21668 at *7–*8. Plaintiffs argue that Defendants' current position—that the Coastal Transition Benefit formula complies with the fractional rule—is inconsistent with their prior position, and thus is foreclosed. But to dispense with Defendants' collateral estoppel argument, Plaintiffs simultaneously represent that the *Tomlinson* court's holdings are not applicable to this suit. They cannot have it both ways. As noted above, the *Tomlinson* decision did not address the legality of the Coastal Transition Benefit formula. Thus, Defendants' position asserted in *Tomlinson* is not inconsistent with their present position—that is, that the Coastal Transition Benefit formula satisfies ERISA's fractional rule. The Court

concludes that neither collateral estoppel nor judicial estoppel forecloses the parties' arguments in this case.

Next, the Court finds that the Coastal Transition Benefit formula satisfies ERISA's fractional rule. The rule requires that, for "any given year, the employee's accrued benefit is proportionate to the number of years of service as compared with the number of total years of service appropriate to the normal retirement age." *Alessi*, 451 U.S. at 514 n.9 (1981). That is precisely the type of proportion that the Coastal Transition Benefit formula sets forth. The Plan actuary's calculations confirm that the formula satisfies the rule. Defs.' Ex. 33, ECF No. 215-2. Defendants concede that the Plan actuary's calculations "do not consider the March 31, 2006 freezing of benefits," but note that it "was unnecessary for them to do so." Defs.' Resp. to Pls.' Mot. 13 n.1, ECF No. 215. Plaintiffs argue that this concession undermines the actuary's conclusion. However, the Court agrees with Defendants that, "[w]hen a benefit formula is frozen, a participant no longer accrues *any* benefits under that formula," and, therefore, the formula cannot possibly concentrate accrual in later service years. Defs.' Reply Mot. 11, ECF No. 217. It follows that "[t]he only way a freeze can violate ERISA's accrual rules is if the benefit was backloaded *before* the freeze, which was not the case here." *Id.* Thus, the Administrator correctly concluded that the Coastal Transition Benefit formula satisfied ERISA's fractional rule.

In sum, the Court concludes that the Administrator's determinations were legally correct. The Court's analysis need not proceed any further. *Wildbur*, 974 F.2d at 638. Plaintiffs' first claim fails as a matter of law.

**B.  Claim II**

Plaintiffs bring their second claim pursuant to ERISA's "anti-cutback" provision, §

204(g), 29 U.S.C. § 1054(g), which states that "[t]he accrued benefit of a participant under a plan

may not be decreased by an amendment of a plan." This prohibition extends to "all of the

amendments to the provisions of a plan affecting, directly or indirectly, the computation of

accrued benefits." Treas. Reg. 144(d)-3(a)(2)(i). Plaintiffs contend that Defendants enacted two

changes that amount to violations of ERISA's anti-cutback provisions. First, Plaintiffs allege that

Defendants retroactively changed the formula "from complying with the 133-1/3% rule to

complying with the fractional rule for the period ending on March 31, 2006." Pls.' Mot. at 30.

Second, Plaintiffs allege that the Coastal Transition Benefit's use of the March 31, 2006 cutoff

for Credited Service in the denominator but not the numerator of the fraction in Part III amounts

to an impermissible cutback. *Id.* at 30–31.

Plaintiffs' sole authority in support of its first argument is *Kifafi*, 616 F.Supp.2d at 25–26.

But *Kifafi* is inapposite. There, unlike in this case, the plan itself expressly stated that it complied

with the 133 1/3% rule. *Id.* at 23–24. However, the *Kifafi* court found that the plan did not

comply with any of the three accrual methods—including the 133 1/3% rule—and, therefore,

violated ERISA's anti-backloading prohibition. *Id.* at 23–24. To address this violation, The *Kifafi*

court interpreted the pre-amendment plan such that participants were "entitled to receive the

benefits they would have accrued had the Plan complied with the 133 1/3% rule." *Id.* at 24.

However, before plaintiffs filed their complaint, the *Kifafi* defendants amended the plan such that

it complied with the fractional rule (not the 133-1/3% rule) but garnered lower benefit amounts

than the court's interpretation of the pre-amendment plan. *Id.* at 25. The *Kifafi* court explained

that this amendment violated ERISA's anti-cutback rule because it decreased the amount of

benefits that participants "would have accrued had the pre-amendment Plan operated in compliance with the 133 1/3% rule" as it had purported to do. *Id.* at 27.

*Kifafi* represents a unique factual scenario that is not analogous to this case. The *Kifafi* court's retroactive rewriting of the plan meant that compliance with the 133-1/3% rule was not a legal argument by the Plan's attorneys, rather, it was part of the actual terms of the plan. Thus, in *Kifafi*, when the defendants amended the plan such that it complied with the fractional rule instead, it was amending those plan terms and reducing the benefits participants had accrued.

Differently, here, the Defendants have previously argued that the Plan's wear-away periods complied with the 133-1/3% rule. *Tomlinson*, 653 F.3d at 1285, 1290. Now, they argue that the Coastal Transition formula—a different aspect of the Plan—complies with the fractional rule. Plaintiffs do not and cannot point to authority that says that attorney argument regarding two separate Plan provisions amounts to an amendment of the Plan's substance. Unlike in *Kifafi*, Defendants' change in legal argument did not change the Plan itself or change the amount of benefits participants have accrued. Accordingly, there is no anti-cutback violation on this basis.

Plaintiffs' second argument fares no better. ERISA's anti-cutback rule prohibits any "plan amendment that decreases a participant's accrued benefits, or otherwise places greater restrictions or conditions on a participant's rights to . . . protected benefits." Treas. Reg. 1.411(d)-3(a)(3)(i). But there is no violation where an amendment "applies with respect to benefits that accrue after the applicable amendment date." *Id.* That is, to assess whether an amendment violated the rule, courts ask whether the amendment "ha[d] the effect of 'eliminating or reducing [a benefit]' that was earned by service before the amendment was passed." *Heinz*, 541 U.S. at 744. If an amendment leads to a reduction of benefits that would have accrued *after* the amendment takes effect, there is no anti-cutback violation. *See id.* at 745–46; *see also*

*Campbell v. BankBoston, N.A.*, 327 F.3d 1, 8 (1st Cir. 2003) ("Benefits already earned under an old plan may not be taken away . . . but benefits expected but not yet accrued are not similarly protected.") (citing I.R.C. § 411(d)(6)(A) (2000) and 29 U.S.C. § 1054(g)).

With these principles in mind, the Court shall briefly detail the 2001 amendment and its effect. The pre- and post-2001 benefit formulas both calculated benefits according to 2% of the final average monthly income multiplied by a participant's years of service (up to 30 years, without reference to the El Paso Plan's March 2006 cut-off date) minus a social security offset. Coastal Plan at § 5.1(a)(i), 21; El Paso Plan at § 4.1(c)(i)(A), 123. To account for employees who opt to retire before the normal retirement age of 65, both plans multiply that figure by a fraction in which the numerator is the participant's credited years of service and the denominator is their projected years of service (i.e., the difference between 65 and the age at which the participant began service). Coastal Plan at § 5.1(c), 22; El Paso Plan at § 4.1(c)(i)(A), 123. But the El Paso Plan, and not the Coastal Plan, provides that the numerator of this fraction is calculated *with* reference to the March 31, 2006 cut-off date, while the denominator is calculated *without* reference to the same. The effect is that individuals who worked before and after the 2006 cut-off date saw a significant reduction in projected accrued benefits after the 2001 merger. For example, under the Coastal Plan, an individual who began working at age 20 in 1970 and retired at age 65 in 2015 would have their accrued benefits multiplied by a fraction of 1, because they worked until normal retirement age, so the numerator and denominator of the fraction are equivalent. But, under the El Paso Plan, their accrued benefits would be multiplied by a fraction equal to 0.8, that is, 36 years (1970 to the 2006 cut-off date) divided by 45 years (1970 to 2015, because the denominator is determined without regard to the cut-off date). The effect is a net reduction in total projected benefits.

24

However, the calculation change did not decrease any already-accrued benefits. It only impacted the amount of benefits participants expected to accrue after the 2006 cut-off date. *Cf. Cinotto v. Delta Air Lines, Inc.*, No. 1:09-CV-01739-JOF, 2010 WL 11519194, at \*9 (N.D. Ga. Sept. 10, 2010), *aff'd*, 674 F.3d 1285 (11th Cir. 2012) ("[A]n employee's accrued benefit at any particular point in time is what a fully vested employee would be entitled to receive under the terms of the plan if employment ceased at that particular point in time." (quoting *Ashenbaugh v. Crucible Inc., 1975 Salaried Ret. Plan*, 854 F.2d 1516, 1524 (3d Cir. 1988))). The Plan's inclusion of a March 31, 2006 cut-off date was certainly unfavorable to benefit accrual subclass members in this case. But it does not run afoul of ERISA's anti-cutback rule. Plaintiffs' second claim fails as a matter of law.

### C.  Claim III

Plaintiffs' third claim maintains that Defendants failed to:

> understandably . . . disclose how the fraction used to compute retirement benefits works. Plaintiffs allege that El Paso and Kinder Morgan both failed to explain that the participants hired by ANR or Coastal at relatively early ages do not earn the 2% of pay benefit promised in the SPD, but instead may earn as little as 1.33% of pay after a fraction based on the years between their date of hire and age 65 is applied. El Paso and Kinder Morgan thus failed to identify circumstances which may result in denial or loss of benefits that the average plan participant might otherwise reasonably expect the plan to provide based on the description of a benefit formula of 2% of pay for up to 30 years.

*Pedersen*, 622 F. Supp. 3d at 538. The 2002, 2006, 2011, and 2017 Summary Plan Descriptions of the Coastal Transition Benefit Formula provide that participants who are "eligible to receive the Coastal Transition Benefit . . . continued to accrue benefits under the Coastal Transition Benefit formula until March 31, 2006, or the date [they] terminated [their] employment, whichever occur[ed] first." Pls.' Ex. 10, 2002 SPD, 29, ECF No. 206-11; Pls.' Ex. 11, 2006 SPD, 19–20, ECF No. 206-12; Pls.' Ex. 20, 2017 SPD including 2011 El Paso SPD, 64–65, ECF No.

206-21 (collectively, "Coastal SPDs").[7] The Coastal SPDs then set out the Coastal Transition

Benefit Formula as the greater benefit of A or B, as follows:

> A. [ [ (i) – (ii) ] x (iii), where:
>
> (i) 2% × Final Average Monthly Earnings (FAME) × credited service projected to age 65 (maximum of 30 years); minus
>
> (ii) 1.5% × Primary Social Security Amount × credited service projected to age 65 (maximum of 33.333 years); times
>
> (iii) credited service at termination (or March 31, 2006, if earlier) divided by credited service projected to age 65
>
> Credited service projected to age 65 is calculated without regard to the March 31, 2006 cut-off.
>
> B. $4.00 x credited service as of March 31, 2001.

*Id.* Under ERISA § 102(a), summary plan descriptions must be "written in a manner calculated

to be understood by the average plan participant" and must be "sufficiently accurate and

comprehensive to reasonably apprise such participants and beneficiaries of their rights and

obligations under the plan." 29 U.S.C. § 1022(a). As such, courts interpret plan summaries from

the perspective of a layperson. *Koehler v. Aetna Health Inc.*, 683 F.3d 182, 188 (5th Cir. 2012);

*Harris Methodist Ft. Worth v. Sales Support Servs. Inc. Emp. Health Care Plan*, 426 F.3d 330,

336 (5th Cir. 2005). Further, courts give ambiguous plan language a meaning as close as possible

to what is said in the plan summary and interpret plan summaries in light of applicable statutes

and regulations.  *Koehler*, 683 F.3d at 189.

§ 102(a) sets forth a comprehensive list of information that a summary plan description

must contain, including "circumstances which may result in disqualification, ineligibility, or

denial or loss of benefits." 29 U.S.C. § 1022(b). One key regulation notes that plan summaries

---

[7] The SPDs contain only minor wording differences that do not affect the Court's analysis. The parties address their arguments towards the SPDs collectively rather than individually; the Court shall follow suit.

"must not have the effect to misleading, misinforming or failing to inform participants and beneficiaries" and that "[a]ny description of exception, limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant." 29 C.F.R. § 2520.102-2(b). Instead, "[s]uch exceptions, limitations, reductions, or restrictions of plan benefits shall be described or summarized" in a similar manner to other plan benefits. *Id.* When crafting SPDs, plan administrators are to "tak[e] into account such factors as the level of comprehension and education of typical participants in the plan and the complexity of the terms of the plan," and should "usually" limit "technical jargon" and use "clarifying examples and illustrations." *Id.* at § 2520.102-2(a).

Plaintiffs contend that the Coastal SPDs' "algebraic" formula, devoid of any explanation or examples, fails to communicate to an average participant that employees hired before age 35 would not earn benefits equal to 2% of their average pay, as described in the normal retirement benefit formula. Defendants, in turn, argue that the Coastal SPDs set out the formula exactly as it appears in the Plan, and any participant could plug their information into the formula and easily determine their accrued benefits at any given point in time.

While it is a close case, the Court agrees with Plaintiffs that the Coastal SPDs' lack of clarifying examples and illustrations has the effect of misleading participants. *See* 29 C.F.R. § 2520.102-2(b). Defendants are correct that the Coastal SPDs set out the Coastal Transition Benefit Formula as it appears in the Plan. But the purpose of a summary plan description is to "enable the average participant in the plan to understand readily the general features of the policy, precisely so that the average participant need not become expert in each and every one of the requirements, provisos, conditions, and qualifications of the policy and its legal terminology." *Hansen v. Cont'l Ins. Co.*, 940 F.2d 971, 981 (5th Cir. 1991).

The Coastal SPDs, and Defendants' other communications with participants, did not explain the effect of the lack of a cap on the III fraction's denominator for participants who were hired before age 35. *See, e.g.*, Pls.' Ex. 22 (2005 presentation explaining Coastal Transition Benefit Formula and flagging March 31, 2006 cut-off date, but not explaining impact of 30-year maximum for credited service in I but not III), ECF No. 206-23. In *Moyle v. Liberty Mut. Ret. Ben. Plan*, the Ninth Circuit held that a summary plan description violated ERISA § 102(a) where it "lack[ed] clarity in communicating how past service credit would be used" in benefit accrual calculations. 823 F.3d 948, 963 (9th Cir. 2016). There, the SPD stated that past service credit "would count toward eligibility, vesting, early retirement, and spousal benefits" and was later interpreted to mean that participants would not receive credit from past service for benefits accrual. *Id.* The *Moyle* court noted that Defendants' previous meetings and communications with employees discussed "past service credit for the purpose of benefits accrual" but never clarified that past service credit would not count towards benefit accrual. Under those circumstances, "it was not sufficient for [defendants] to simply assume that [plaintiffs] would understand that they would not get credit for benefits accrual when they saw the words 'eligibility' and 'vesting,' assuming that plan participants understood what 'accrual' meant at all." *Id.*

Here, too, the Court finds that the Coastal SPDs' recitation of a somewhat complex formula, without any clarifying examples, risks misleading participants who were hired before age 35 as to their total amount of accrued benefits. 29 C.F.R. § 2520.102-2(a), (b). Rather than merely restating the Plan's formula, the SPDs should have included explanatory language or illustrations. *See Hansen*, 940 F.2d at 981; *see also Thomason v. Metro. Life Ins. Co.*, 165 F. Supp. 3d 512, 521 (N.D. Tex. 2016) (concluding that summary plan description had "the effect of misleading" where it did not identify circumstances that would result in loss of benefits),

*aff'd*, 703 F. App'x 247 (5th Cir. 2017). Therefore, as to Claim III, the Court concludes that Plaintiffs are entitled to judgment as a matter of law.

### D.  Claim IV

Like Claim II, Claim IV alleges that Defendants violated ERISA's anti-cutback protection. The Retirement Equity Act of 1984 clarified that ERISA's anti-cutback provisions apply to amendments that affect early retirement benefits. *See Shaver v. Siemens Corp.*, 670 F.3d 462, 472 (3d Cir. 2012); *McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1119 (9th Cir. 2000). ERISA § 204(g) provides that "eliminating or reducing an early retirement benefit or a retirement-type subsidy . . . with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits." 29 U.S.C. § 1054(g). § 204(g) prohibits the elimination or reduction of "retirement-type" benefits "with respect to a participant who satisfies (either before or after the amendment) the preamendment conditions for the subsidy." *Id* at § 1054(g)(2).

When the Coastal Corporation and El Paso merged in 2001, former Coastal employees (including former ANR employees) who had accumulated 5 years of service by age 55 were entitled to unreduced early retirement benefits at age 62. El Paso Plan at 119. Such individuals could likewise elect to commence benefits before age 62 and receive benefits reduced by 4% per year the commencement date preceded the date they reached 62. *Id.* at 126. Then, after El Paso sold ANR to TransCanada in 2007, it amended its Plan such that participants employed by ANR "shall be deemed to have terminated employment" under the Plan on February 22, 2007 (the date of sale). Ninth Amendment at 2; *see also* 2007 Notice at 2. El Paso later carved out an exception that permitted ANR employees who were 53 and had completed five years of service as of February 22, 2007 to keep their entitlement to unreduced early retirement benefits. Ninth

Amendment at 2; *Pedersen*, 622 F. Supp. 3d. at 535. Plaintiffs contend that these amendments unlawfully eliminated their ability to accumulate service that would make them eligible for early retirement benefits.

The Internal Revenue Service's ("IRS") Revenue Ruling 85–6 "takes the position that an employee can satisfy the eligibility requirements for early retirement benefits after the early retirement plan is terminated." *Gillis v. Hoechst Celanese Corp.*, 4 F.3d 1137, 1145 (3d Cir. 1993) (citing Rev. Rul. 85-6, 1985-1 C.B. 133 (1985)).[8] Courts in this circuit and others have followed suit and concluded that § 204(g)(2) prohibits plan sponsors from amending a plan in a manner that cuts off participants' ability to grow into early retirement eligibility. *See, e.g.*, *Harms v. Cavenham Forest Indus., Inc.*, 984 F.2d 686, 692 (5th Cir. 1993), *as amended on denial of reh'g* (Apr. 7, 1993); *Gillis*, 4 F.3d at 1145–47; *id.* at 1150 (Alito, J., concurring) ("I believe that Rev. Rul. 86–6 should be heeded."); *Bellas v. CBS, Inc.*, 221 F.3d 517, 521 (3d Cir. 2000); *Ahng v. Allsteel, Inc.*, 96 F.3d 1033, 1036–37 (7th Cir. 1996); *Alcantara v. Bakery & Confectionery Union & Indus. Int'l Pension Fund Pension Plan*, 751 F.3d 71, 78 (2d Cir. 2014); *Adams v. Bowater Inc.*, 292 F. Supp. 2d 191, 197 (D. Me. 2003).

While not binding on this Court, *Gillis v. Hoechst Celanese Corp.* is particularly instructive here. In *Gillis*, the defendant plan sponsor sold one of its divisions to a separate company. *Id.* at 1140. The *Gillis* plaintiffs—employees of the sold division—continued to work

---

[8] Specifically, the Ruling explains that an employer may satisfy ERISA § 204(g)(2)'s anti-cutback provision after terminating an early retirement plan via two different methods. Those methods are:

> First, annuity contracts may be purchased from an insurance company that provides for the retirement-type subsidy in the event any participant, subsequent to plan terminations, satisfies the pretermination conditions of age 55 with 30 years of service necessary to receive the subsidized benefits. Second, the plan on termination may be amended to provide such subsidized benefits whether or not participants subsequently satisfy the necessary conditions. In order for the plan to remain qualified, such an increase in benefits must satisfy other Code requirements, be provided in a nondiscriminatory manner, and be distributed in a manner that is permitted with respect to an individual who has satisfied the conditions necessary for such subsidized benefits.

Rev. Rul. 85–6, 1985-1 C.B. 133 (1985).

in their same jobs for the new company. *Id.* The plaintiffs alleged that the defendants "failed to transfer sufficient funding to the [new company's] Retirement Plan to fund their early retirement benefits." *Id.* The district court concluded that the plaintiffs' right to early retirement benefits was not protected by ERISA because the plaintiffs did not satisfy the eligibility requirements for early retirement at the time of their division's sale. *Id.* at 1143. The Third Circuit reversed. It explained that "an employee is not separated from service if the employee continues on in the same job for a successor employer." *Id.* at 1147 (citing 26 C.F.R. 1.411(d)–4 (Q & A 3) (1992)). Because the *Gillis* plaintiffs therefore had not separated from service, the court concluded that a subsequent plan amendment could not stop the plaintiffs from "continu[ing] to accumulate years of service while working for [the new company and successor employer] to be counted towards qualifying early retirement benefits." *Id.* at 1147–48.

In this case, as in *Gillis*, El Paso sold ANR—a subset of its larger company—to TransCanada, but ANR employees continued to work in their same jobs. Thus, the ANR employees were not separated from service, as they "continued on in the same job for a successor employer." *Id.* at 1147. Therefore, El Paso was required to allow the ANR employees to "continue to accumulate years of service while working for [TransCanada] to be counted towards qualifying early retirement benefits." *Id.* at 1147–48.

Defendants attempt to distinguish *Gillis* by citing to *Hunger v. AB*, 12 F.3d 118, 121–22 (8th Cir. 1993), *Dade v. N. Am. Philips Corp.*, 68 F.3d 1558, 1563 (3d Cir. 1995), *Hein v. F.D.I.C.*, 88 F.3d 210, 216 (3d Cir. 1996), and *Andes v. Ford Motor Co.*, 70 F.3d 1332 (D.C. Cir. 1995). The courts in those four cases examined situations in which retirement plan participants lost their ability to grow into early retirement eligibility, but determined that there were no anti-cutback violations. However, none of those cases involved a plan amendment. *See Hunger*, 12

31

F.3d at 121; *Dade*, 68 F.3d at 1563; *Hein*, 88 F.3d at 216; *Andes*, 70 F.3d at 1335. As those cases rightly explain, there is no § 204(g) violation where plaintiffs become unable to grow into early retirement eligibility as a result of a corporate transaction *alone*—for example, where the plan expressly credits service with specific entities, and the result of a sale is that plaintiffs no longer work for a listed entity. *See Adams*, 292 F. Supp. 2d at 197 (discussing *Dade* and *Andes*). Here, as in *Gillis* and similar cases, and unlike in *Dade*, *Hein*, *Andes*, and *Hunger*, it was a plan amendment following a transfer—not the transfer alone—that prevented Plaintiffs from being able to grow into early retirement eligibility.

Contrary to Defendants' assertions, ANR employees' termination from El Paso's Plan was not automatic upon El Paso's sale of ANR to TransCanada. The El Paso Plan's definition of "Employer" explicitly included "ANR Corporation." El Paso Plan at § 1.22, 15 (noting that "Employer" as set forth in the Plan included "each subsidiary and affiliate" that it identified as a "participating Employer as listed in Appendix I"); *id.* at Appendix I, 85–86 (including ANR corporation as a "participating Employer[] pursuant to Section 1.22" beginning 01/29/01 with no specified end date).

Section 11.3 of the Plan provided procedures which a participating employer—such as ANR—could affirmatively take to withdraw from participation in the Plan. *Id.* at 74. Then, the Ninth Amendment changed Section 11.3 such that, as of February 22, 2007, participating employers such as ANR would "automatically" cease being participating employers following a transfer, and, likewise, employees of such a company would automatically be considered to have terminated employment on the relevant transaction's closing date. Ninth Amendment at 4. The Ninth Amendment also explicitly provided that ANR employees would no longer be able to grow into early retirement eligibility following the 2007 sale date. *Id.* at 2; *see also* 2007 Notice

at 2 ("[T]he Plan is being amended to provide that ANR Pipeline Company will cease to be a participating employer in the Plan on and after the closing date of the Sale.").

To summarize, under the pre-amendment version of the El Paso Plan, ANR would have continued to be a participating employer following the sale to TransCanada, so long as it did not take affirmative steps to withdraw from participation. The amendment to the Plan, not the sale, altered the status quo, when it removed ANR as a participating Employer. Therefore, this case parallels the *Gillis* line of cases, in which Courts have found that plan amendments violated ERISA § 204(g).

Accordingly, the Court concludes that the Ninth Amendment violates § 204(g)'s anti-cutback prohibition.[9] As to this claim, the Court denies Defendants' Motion and grants Plaintiffs' Motion.

### E.  Claim V

This next claim asks the Court to interpret and enforce the ANR Legacy provision of El Paso's (now Kinder Morgan's) Plan such that Plaintiffs would be entitled to unreduced benefits at age 62.[10] That provision calculates eligible ANR employees' benefits as "A + B," where "A"

---

[9] Defendants also rely on I.R.S. Gen. Couns. Mem. 39,824 (I.R.S. Aug. 15, 1990) to argue that there was a severance of employment such that Plaintiffs' continued service with ANR did not count towards the El Paso Plan. This reliance is misplaced. First, the content of this 1990 informal guidance has never been codified by statute or regulation and therefore does not bind this Court. Courts have noted that only "where there is no case law [on] point" is it "arguably permissible to use GCMs to *instruct* the court on how the IRS interprets [statutory provisions]." *Dade v. N. Am. Philips Corp.*, No. CIV. A. 93-5016, 1994 WL 419668, at *7 (D.N.J. Aug. 10, 1994), *aff'd*, 68 F.3d 1558 (3d Cir. 1995) (quoting *Morganbesser v. United States*, 984 F.2d 560, 563 (2d Cir. 1993)). Here, there is relevant case law, and so such instruction is unneeded. Second, as Plaintiffs note, the provisions Defendants cite in the memorandum address distributions from qualified plans under IRC § 401(a) upon a "severance from employment," and do not speak to ERISA's anti-cutback protections. *See id.* at *2, *5. Placed beside the IRS Revenue Ruling 85–6 and the case law just discussed, the IRS Memorandum does not alter the Court's analysis.

[10] In its August 2022 decision, this Court was under the impression that Claim V was an alternative argument that the Court need only address if Claim IV failed. *See Pedersen*, 622 F. Supp. 3d at 530. However, Plaintiffs' Motion for Partial Summary Judgment states: "This Court should rule that Defendants violated the anti-cutback rule of ERISA § 204(g)(2) by adopting this amendment. . . . [T]his Court should also rule that the former ANR employees were entitled to unreduced benefits at age 62 under the separate 'ANR Grandfather' provision in the plan." Pls.' Mot. at 43. Plaintiffs also informed the Court in the November 30, 2023 hearing on Plaintiffs' Motion for Class

equals their benefits under the Coastal Transition formula (discussed at length above) and "B" equals a much smaller, separate amount that is calculated based on their pre-1986 service with ANR. El Paso Plan at § 4.1(c)(iv), 124–25.

In partially granting Mr. Pedersen's benefits claim, the Plan Administrator specified that the ANR Legacy provision provides that, where an ANR legacy participant commences benefits at age 62, "B" is not actuarially reduced, but "A" is (provided that the participant had not otherwise met the criteria for early retirement eligibility). Pls.' Ex. 4 at 9–10.

The Administrator further explained that, "prior to March 31, 2018, an error existed in the Plan recordkeeper's system which caused Mr. Pedersen and others similarly situated to be incorrectly categorized as having satisfied the Early Retirement Criteria prior to terminating employment." *Id* at 8. Thus, for many years, the benefit estimator had been incorrectly showing that Mr. Pedersen and other similarly situated participants could receive an unreduced benefit at age 62. *Id.*

Plaintiffs argue that the Plan had previously been interpreted such that "A" and "B" were *both* unreduced if ANR legacy participants commenced benefits at age 62 and later. Plaintiffs contend that the Plan Administrator's most recent interpretation amounts to an abuse of discretion. For the reasons that follow, the Court agrees.

### 1.   Whether the Administrator's interpretation was legally correct

This first step considers "(1) whether the administrator has given the plan a uniform construction, (2) whether the interpretation is consistent with a fair reading of the plan, and (3)

---

Certification that "[Claims] IV and V are . . . not alternative claims." Nov. 30, 2023 Hr'g Tr. 6:17–18. The Court surmises from these representations that there must be some class members who are eligible for unreduced benefits under Plaintiffs' interpretation of the ANR Legacy provision, but who would not otherwise be eligible to grow into early retirement (perhaps due to a break in service, or if they were over 55 with fewer than 5 years of service in 1986). Such a class member would be eligible for unreduced benefits at 62 under Claim V, but not Claim IV. The Court is skeptical that such a class member exists, but, for the avoidance of doubt, it shall assess the parties' Motions for Summary Judgment as to Claim V.

any unanticipated costs resulting from different interpretations of the plan." *Wildbur*, 974 F.2d at 638.

As an initial matter, Defendants argue that the Court's analysis may not consider evidence outside of the record regarding the Administrator's previous interpretations of the legacy provision. In so arguing, Defendants point to the Fifth Circuit's pronouncement that district courts may not "receiv[e] evidence to resolve disputed material facts—i.e., a fact the administrator relied on to resolve the merits of the claim itself." *Vega*, 188 F.3d at 299. The Court does not read this statement to exclude evidence of the Administrator's previous interpretations for three reasons. First, an administrator's previous plan interpretations do not fit neatly into the class of "fact[s that] the administrator relied on to resolve the merits of the claim itself." *Id.* Second, if the Court adopted Defendants' proffered reading, evidence of a plan administrator's previous inconsistent interpretations could almost never be considered. If a plaintiff sought to introduce evidence showing that the administrator previously adopted an inconsistent plan interpretation, the defendant could merely raise a factual dispute to shield the inconsistent interpretation from the court's purview. Such an outcome contravenes the Fifth Circuit's explicit allowance for "evidence related to how an administrator has interpreted terms of the plan in other instances." *Id.* (citing *Wildbur*, 974 F.2d at 639 & n. 15). Lastly, the purpose of limiting a district court's review to the administrative record is to avoid frustrating ERISA's goal of prompt resolution of claims by plan fiduciaries by turning district courts into "substitute plan administrators." *Wildbur*, 974 F.2d at 639. While review of factual evidence not previously presented to the administrator frustrates this goal, review of an administrator's own prior interpretations does not. As such, this Court finds that it may consider evidence of the Plan Administrator's previous interpretations of the Plan. By contrast, if it had been offered, the Court

could not consider external evidence of the facts the Administrator used to resolve Mr. Pedersen's claims—for example, if there was a dispute as to Mr. Pedersen's age or how many years of service Mr. Pedersen had accumulated by a certain year.

Particularly in light of the Administrator's previous Plan interpretations, the Court concludes that its most recent interpretation was not legally correct. A lack of uniform construction over time can indicate that an Administrator's interpretation is legally incorrect. *See Dennard v. Richards Grp., Inc.*, 681 F.2d 306, 315 (5th Cir. 1982). Therefore, in assessing "uniformity of construction," it is appropriate to consider whether the Plan Administrator has applied the same construction to similarly situated claimants in the past. *See Krishna v. Life Ins. Co. of N. Am.*, No. 22-20516, 2023 U.S. App. LEXIS 18648, at *15 (5th Cir. 2023) (explaining that Defendant argued it satisfied this factor where it had "applied its interpretation uniformly for at least a dozen years"); 29 C.F.R. § 2560.503-1(b)(5) (requiring that, when making claim determinations, plan administrators ensure that "where appropriate, the plan provisions have been applied consistently with respect to similarly situated claimants").

Plaintiffs point to a deluge of evidence demonstrating that, over the course of 17 years, the Plan Administrators consistently interpreted the ANR Legacy provision to mean that the entirety of eligible ANR participants' benefits—that is, "A + B," not just "B"—would be available with no actuarial reduction at age 62. This evidence includes 2006 and 2015 "Calculation Reference Manuals" prepared by a consulting firm for El Paso to explain "how benefits are to be calculated." *See* Pls.' Ex. 7, Kevin Minor Dep., 106:11–12, ECF No. 206-8. Those Manuals note in multiple places that eligible ANR employees are to receive the Coastal transition benefit and the ANR legacy benefit ("A + B") with no reduction if commenced at or after age 62. Pls.' Ex. 32, 2006 Mercer Manual, 9–10, 12, 15, 18, 20, 23, ECF No. 206-33; Pls.'

Ex. 33, 2015 Mercer Manual, 4–5, 7, 9, 11, 14, 17, ECF No. 206-34.[11] Emails from the Plan's

ERISA counsel and Benefits Analyst sent in 2007 and 2006, respectively, and a 2005

PowerPoint presentation given to Plan participants, confirm that Defendants adopted this

interpretation. *See* Pls.' Ex. 36, 4, ECF No. 206-37 (email from Plan's ERISA counsel noting

that "the Coastal Transition Benefit at the pension starting date, which includes the ANR

[Legacy]" is subject to "no reduction if benefits commence at or after age 62"); Pls.' Ex. 28, 4,

ECF No. 206-29 (email from Benefits Analyst to ANR employees stating "eligible ANR

participants . . . that terminate as term vested employees (before age 55) . . . will be able to

receive their unreduced age 65 benefit at age 62" and describing this as a "'special' provision for

eligible ANR employees only"); Pls.' Ex. 22, at 32 (2005 presentation notes that Coastal

Transition Benefit is "unreduced at age 62 for ANR participants employed as of 12/1/86").

      Later, in 2018 and 2019 letters to ANR participants, the Plan Administrator reversed

course, claiming that eligible ANR participants were not entitled to unreduced benefits at age 62.

*See* Pls.' Ex. 40, ECF No. 206-41; Pls.' Ex. 41, ECF No. 206-42; Pls.' Ex. 42, ECF No. 206-43;

Pls.' Ex. 43, ECF No. 206-44. The letters did not reference Kinder Morgan's previous

interpretations of the ANR Legacy provision or purport to reinterpret the provision. They merely

referred to an "error" as the cause of Participants' ineligibility for unreduced benefits. It was only

the Administrator's denial of Pedersen and Schmidgall's claims for benefits that offered a

---

[11] Defendants argue that the Court should not consider these Manuals because they are proffered to "resolve factual disputes" and "easily could have been presented to the administrator by the [plaintiff's] counsel," as Plaintiffs produced the Manuals as part of their initial disclosures in 2022. Defs.' Resp. to Pls.' Mot. at 42 (citing *Vega*, 188 F.3d at 299–300). The Court has already clarified that it may consider evidence—such as the Manuals—that is outside of the administrative record insofar as it demonstrates the Administrators' previous Plan interpretations. To the extent Defendants are arguing that Pedersen failed to exhaust his administrative remedies by not referencing the Manuals in the underlying administrative proceeding, they fail to cite to any case law indicating that claimants must exhaust each issue—as opposed to each claim—in the ERISA context. *Cf. Vaught v. Scottsdale Healthcare Corp. Health Plan*, 546 F.3d 620, 632 (9th Cir. 2008) (discussing *Sims v. Apfel*, 530 U.S. 103, 108–11 (2000) and *id.* at 112–13 (O'Connor, J., concurring) and concluding that issue exhaustion is inapplicable in the ERISA context). Ultimately, the Court concludes that it may consider the Manuals in its analysis.

revised interpretation of the provision. Pls.' Ex. 4 (letter denying Pedersen claim for benefits); Pls.' Ex. 44, ECF No. 206-44 (letter denying Schmidgall appeal). These various equivocal interpretations show that the Plan Administrator has not given the Plan a uniform construction over time.

Defendants' past treatment of the Plan similarly evinces that the Administrator's interpretation does not amount to a fair reading of the plan. This second factor is the "most important" in the legal correctness inquiry. *N. Cypress Med. Ctr*, 781 F.3d at 195 (quoting *Crowell*, 541 F.3d at 313). In isolation, the Plan language is ambiguous. On the one hand, it could be read as Defendants suggest, such that the use of the word "additional" signifies that only "B" is unreduced. On the other hand, the use of the phrase "This additional ANR [legacied] benefit" where the entire subsection is entitled "ANR Legacy" could signify that the entire "A + B" benefit is unreduced. Moreover, if it meant to signify the meaning Defendants attribute to it, the Plan text could have more explicitly stated that only the second portion of the formula was subject to the early retirement or Vested Termination benefit reduction if benefits are commenced before age 62. That is to say, the text, standing on its own, is not definitive. But the text does not stand on its own. It stands beside Defendants' 17 years of interpreting the text in a uniform manner. *See Cottillion v. United Ref. Co.*, No. CA 09-140 ERIE, 2013 WL 1419705, at *12 (W.D. Pa. Apr. 8, 2013) ("[T]o the extent that the language of the Plan Documents is ambiguous or susceptible to multiple interpretations, including that offered by the Defendants, the Plan Administrator's long-standing interpretation of those provisions (which provided for unreduced benefits) is entitled to deference, as previously discussed."), *aff'd*, 781 F.3d 47 (3d Cir. 2015). Defendants, moreover, acknowledge that an "administrator's long-standing course of performance" can "support[ a] plaintiffs' interpretation of the provision" and that "when there

are two equally plausible ways to interpret a plan provision, an administrator's history of acting in accordance with one of those interpretations can resolve that ambiguity." Defs.' Resp. to Pls.' Mot. at 40 (citing *Cottillion*, 2013 WL 1419705, at *12). Thus, particularly in light of its history of treating ANR participants' total accrued benefits (that is, "A + B") as unreduced at age 62, the Court concludes that the Administrator's contrary interpretation was not a fair reading of the Plan.

The parties' briefs did not focus on the "unanticipated costs" factor and the Court is accordingly ill equipped to make a finding as to this factor. *See Jordan v. Cameron Iron Works, Inc.*, 900 F.2d 53, 56 (5th Cir. 1990). However, the Court finds that the first two factors support a conclusion that the Administrator's interpretation of the ANR Legacy provision was legally incorrect. Thus, the Court shall proceed to the second prong of the analysis.

**2. Whether the Administrator's interpretation was an abuse of discretion**

For this second step of the inquiry, the Court considers (1) the internal consistency of the plan under the administrator's interpretation, (2) any relevant regulations formulated by the appropriate administrative agencies, and (3) the factual background of the determination and any inferences of lack of good faith, including whether the administrator had a conflict of interest in interpreting the plan. *Wildbur*, 974 F.2d at 638; *Connecticut Gen. Life Ins. Co. v. Humble Surgical Hosp., L.L.C.*, 878 F.3d 478, 484 (5th Cir. 2017); *N. Cypress Med. Ctr*, 781 F.3d at 196.

The just-discussed prior interpretations of the plan, combined with regulations requiring administrators to consider how "the plan provisions have been applied consistently with respect to similarly situated claimants," intimate that the Administrator abused its discretion in this case. 29 C.F.R. § 2560.503-1(b)(5). Plaintiffs also suggest that the Administrator's interpretation was in bad faith, as it was "the product of conflicts of interest." Pls.' Mot. at 49. Specifically,

Plaintiffs allege that Kinder Morgan's President and CEO reviewed estimates of the cost of providing unreduced benefits of "A + B" versus "B" alone, and subsequently decided to prevent ANR legacy employees from receiving unreduced "A + B" benefits. *Id.* at 49–50. In support, Plaintiffs reference the deposition testimony of Benefits Director Chris Noonan, who stated that it was "Kinder Morgan's President and CEO" who "made the decision" to provide unreduced "A + B" benefits only to those who had already commenced benefits, and to provide unreduced "B" benefits to ANR participants who had not commenced benefits. Pls.' Ex. 46, Noonan Dep., 89:8–22, ECF No. 206-47.

Defendants deny that Kinder Morgan executives were involved in the Administrator's claim determination process. They claim that Magistrate Judge Palermo's multiple rulings addressing discovery disputes over various documents stand for the broader proposition that "Kinder Morgan executives were not involved in the underlying claims process in any [way]." Defs.' Reply Mot. at 26; Defs.' Resp. to Pls.' Mot. at 41–42 n.10. To the contrary, Judge Palermo merely concluded that eight documents Plaintiffs sought to obtain during discovery were privileged, as they were prepared to assist in providing legal advice to Kinder Morgan executives, rather than to help Kinder Morgan executives decide claims for benefits. ECF No. 138, 7–9; ECF No. 170 4–5; ECF No. 185, 9–10. The overall extent of the executives' involvement in the reinterpretation of the ANR legacy provision was not a question before Judge Palermo. Thus, her ruling does not, on its own, contravene the Benefit Director's pronouncement that the executives were the ultimate decisionmakers as to how the benefits would be awarded. Noonan Dep. 89:8–22.

Even if the Benefit Director's words are not taken at face value, and the Court assumes that Kinder Morgan's President and CEO did not make the ultimate call as to plan interpretation,

the facts indicate that the Administrator's interpretation was made in bad faith. The Administrator's decision does not reference Defendants' previous interpretation of the legacy provision, the fact that its decision represented a reinterpretation, or any supporting reasons as to why this new interpretation was a better one. *See* Pls.' Ex. 4 at 9–10. All in all, the Administrator's most recent interpretation strikes the Court as a post-hoc, cost-saving measure, rather than a good-faith reconsideration of prior interpretations. Thus, the Court concludes that the Plan Administrator abused its discretion in interpreting the ANR Legacy provision of the Plan.

Therefore, as to Claim V, the Court grants Plaintiffs' Motion for Summary Judgment, and denies Defendants' Motion.

### F.  Claim VI

Plaintiffs' final claim is an alternative argument to Claims IV and V. In the hearing on Plaintiffs' Motion for Class Certification, Plaintiffs clarified as much, stating:

> Claim VI would be an alternative argument . . . [it] wouldn't have to be reached if . . . a [Plan] participant was able to age into early retirement eligibility pursuant to [Claim IV], or if they had received an unreduced benefit at age 62 [pursuant to Claim V].

Nov. 30, 2023 Hr'g. Tr. 6:7–16. Because the Court has granted Plaintiffs' Motion for Summary Judgment as to Claims IV and V, it need not address Plaintiffs' alternative argument. Claim VI is therefore denied as moot. Additionally, because Defendants' Motion for Leave to File a Sur-Reply only pertains to Claim VI, it is also denied as moot.

41

## V.        CONCLUSION

As set forth above, the Court **DENIES** Defendants' Motion to Exclude and

**OVERRULES** Plaintiffs' Objections to Lawrence Sher's testimony. The Court also **DENIES**

Defendants' Motion for Leave.

Turning to the parties' respective Motions for Summary Judgment, the Court grants both

Motions in part and denies both in part.

As to Claims I and II, the Court **DENIES** Plaintiffs' Motion and **GRANTS** Defendants'

Motion. Claims I and II are **DISMISSED WITH PREJUDICE**. Claim VI is **DISMISSED**

**WITHOUT PREJUDICE**, as it is moot.

As to Claims III, IV, and V, the Court **GRANTS** Plaintiffs' Motion and **DENIES**

Defendants' Motion.

The Court **ORDERS** that the parties meet and discuss how they wish to proceed in this

case and file a Joint Status Report with the Court within **four weeks** of the issuance of this

Order. The Court may consider extending this date upon joint request of the parties. The parties'

Joint Status Report should describe the remaining issues regarding equitable relief to be ruled on

by the Court and propose a related briefing schedule. Alternatively, the parties may contact the

Court if they would like a referral to mediate the remaining issues before Magistrate Judge Dena

Hanovice Palermo.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas on this the 24th day of July, 2024.

_____
Keith P. Ellison
United States District Judge